# United States District Court

### EASTERN DISTRICT OF TEXAS
### SHERMAN DIVISION

| | | |
|---|---|---|
| MOTIO, INC. | § | |
| | § | |
| V. | § | CASE NO. 4:12-CV-647 |
| | § | Judge Mazzant |
| BSP SOFTWARE LLC, | § | |
| BRIGHTSTAR PARTNERS, INC., | § | |
| and AVENT, INC. | § | |

## <u>**MEMORANDUM OPINION**</u>

On July 29, 2015, the Court held a hearing to determine the proper construction of the disputed claim terms in United States Patent No. 8,285,678 ("the '678 Patent"). After considering the arguments made by the parties at the hearing and in the parties' claim construction briefing (Dkt. #43, #44, #45, #49, and #55), the Court issues this Claim Construction Memorandum Opinion.

# TABLE OF CONTENTS

I.      BACKGROUND ................................................................................................................. 3

II.     APPLICABLE LAW ......................................................................................................... 4

III.    CONSTRUCTION OF DISPUTED TERMS ..................................................................... 6

      1.   "automated agent" ........................................................................................................ 6

      2.   "automatic / automated version control" ..................................................... 13

      3.   "report specification" / "analysis cube" ....................................................... 20

      4.   "detecting a request … to modify" ................................................................ 27

IV.     CONCLUSION ................................................................................................................. 32

# I.   BACKGROUND

The '678 Patent is titled "Continuous integration of business intelligence software."  It was filed on December 30, 2010, and issued on October 9, 2012.  The '678 Patent relates to methods of providing automatic version control to a business intelligence system. '678 Patent at Abstract.[1]  Business intelligence systems are used to gather, store, analyze, and report on business metric data, such as factory production, personnel productivity in a manufacturing facility, or trends in sales in a retail store environment. *Id.* at 1:28–35.  The specification states that "[t]he purpose of the invention is to continuously monitor, verify, and report on the business intelligence software." *Id.* at 4:31–32.  The specification adds that "[t]his is done via an automated agent that executes one or more test cases that are comprised within a test suite." *Id.* at 4:32–34.  The specification further states that "[t]he invention also automatically stores versions of the work done by the business intelligence software user." *Id.* at 4:34–36.  The specification indicates that "[t]he method utilizes a source control system to record and maintain current and historical versions of the business intelligence artifacts during the development or revision of the business intelligence artifacts." *Id*. at 3:41–44.

---

[1] The Abstract of the '678 Patent follows:

> A method for providing automatic version control to a business intelligence system includes receiving business metric data from a business intelligence system, creating an initial version of a business intelligence artifact derived from the received business metric data, automatically storing the initial version of the business intelligence artifact with a source control system, detecting a request to the business intelligence system to modify the initial version of the business intelligence artifact, creating a subsequent version of the business intelligence artifact that includes the requested modification, and automatically storing the subsequent version of the business intelligence artifact with the source control system.

Plaintiff brings suit alleging infringement of claims 1-4 and 7-10 of the '678 Patent. Claim 1 of the '678 Patent is representative of the asserted claims and recites the following elements (disputed terms in italics):

> 1. In a general purpose computer, a method for providing *automatic version control* to a business intelligence system, comprising:
>
> creating an initial version of a business intelligence artifact in the business intelligence system, wherein the business intelligence artifact is a user-authored object that produces output when the business intelligence artifact is executed in the business intelligence system, and wherein the business intelligence artifact is selected from the group consisting of: a *report specification* and an *analysis cube*;
>
> providing an *automated agent* that interfaces with the business intelligence system to provide *automated version control* to the business intelligence artifact; the *automated agent* independently performing the steps of:
>
> automatically storing the initial version of the business intelligence artifact with a version control system;
>
> *detecting a request to the business intelligence system to modify* the initial version of the business intelligence artifact to create a subsequent version of the business intelligence artifact that includes the requested modification; and
>
> automatically storing the subsequent version of the business intelligence artifact in the version control system.

## II.     APPLICABLE LAW

"It is a 'bedrock principle' of patent law that 'the claims of a patent define the invention to which the patentee is entitled the right to exclude.'" *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312 (Fed. Cir. 2005) (en banc) (quoting *Innova/Pure Water Inc. v. Safari Water Filtration Sys., Inc.*, 381 F.3d 1111, 1115 (Fed. Cir. 2004)).  To determine the meaning of the claims, courts start by considering the intrinsic evidence. *See id.* at 1313; *C.R. Bard, Inc. v. U.S. Surgical Corp.*, 388 F.3d 858, 861 (Fed. Cir. 2004); *Bell Atl. Network Servs., Inc. v. Covad Commc'ns Group, Inc.*, 262 F.3d 1258, 1267 (Fed. Cir. 2001).  The intrinsic evidence includes the claims themselves, the specification, and the prosecution history. *See Phillips*, 415 F.3d at 1314; *C.R. Bard, Inc.*, 388

F.3d at 861.  Courts give claim terms their ordinary and accustomed meaning as understood by one of ordinary skill in the art at the time of the invention in the context of the entire patent. *See Phillips*, 415 F.3d at 1312–13; *Alloc, Inc. v. Int'l Trade Comm'n*, 342 F.3d 1361, 1368 (Fed. Cir. 2003).

The claims themselves provide substantial guidance in determining the meaning of particular claim terms. *Phillips*, 415 F.3d at 1314.  First, a term's context in the asserted claim can be very instructive. *Id*.  Other asserted or unasserted claims can also aid in determining the claim's meaning because claim terms are typically used consistently throughout the patent. *Id*. Differences among the claim terms can also assist in understanding a term's meaning. *Id*.  For example, when a dependent claim adds a limitation to an independent claim, it is presumed that the independent claim does not include the limitation. *Id*. at 1314–15.

"[C]laims 'must be read in view of the specification, of which they are a part.'" *Id*. (quoting *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 979 (Fed. Cir. 1995) (en banc)). "[T]he specification 'is always highly relevant to the claim construction analysis. Usually, it is dispositive; it is the single best guide to the meaning of a disputed term.'" *Id*. (quoting *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996)); *Teleflex, Inc. v. Ficosa N. Am. Corp.*, 299 F.3d 1313, 1325 (Fed. Cir. 2002).  This is true because a patentee may define his own terms, give a claim term a different meaning than the term would otherwise possess, or disclaim or disavow the claim scope. *Phillips*, 415 F.3d at 1316.  In these situations, the inventor's lexicography governs. *Id*.  The specification may also resolve ambiguous claim terms "where the ordinary and accustomed meaning of the words used in the claims lack sufficient clarity to permit the scope of the claim to be ascertained from the words alone." *Teleflex, Inc.*, 299 F.3d at 1325.  But, "'[a]lthough the specification may aid the court in interpreting the meaning of

disputed claim language, particular embodiments and examples appearing in the specification will not generally be read into the claims.'" *Comark Commc'ns, Inc. v. Harris Corp.*, 156 F.3d 1182, 1187 (Fed. Cir. 1998) (quoting *Constant v. Advanced Micro-Devices, Inc.*, 848 F.2d 1560, 1571 (Fed. Cir. 1988)); *see also Phillips*, 415 F.3d at 1323. The prosecution history is another tool to supply the proper context for claim construction because a patent applicant may also define a term in prosecuting the patent. *Home Diagnostics, Inc., v. Lifescan, Inc.*, 381 F.3d 1352, 1356 (Fed. Cir. 2004) ("As in the case of the specification, a patent applicant may define a term in prosecuting a patent.").

Although extrinsic evidence can be useful, it is "'less significant than the intrinsic record in determining the legally operative meaning of claim language.'" *Phillips*, 415 F.3d at 1317 (quoting *C.R. Bard, Inc.*, 388 F.3d at 862). Technical dictionaries and treatises may help a court understand the underlying technology and the manner in which one skilled in the art might use claim terms, but technical dictionaries and treatises may provide definitions that are too broad or may not be indicative of how the term is used in the patent. *Id.* at 1318. Similarly, expert testimony may aid a court in understanding the underlying technology and determining the particular meaning of a term in the pertinent field, but an expert's conclusory, unsupported assertions as to a term's definition are entirely unhelpful to a court. *Id.* Generally, extrinsic evidence is "less reliable than the patent and its prosecution history in determining how to read claim terms." *Id.*

### III.    CONSTRUCTION OF DISPUTED TERMS

The parties' dispute focuses on the meaning and scope of five terms/phrases in the '678 Patent.

### 1.   "automated agent"

| Disputed Term | Plaintiff's Proposal | Defendants' Proposal |
|---|---|---|
| "automated agent" | "software that interfaces with a business intelligence system to provide automated version control to a business intelligence artifact, wherein such version control automatically functions without an approval process" | "software that interfaces with a business intelligence system to provide automated version control to a business intelligence artifact" |

### a) The Parties' Positions

The parties agree that the recited "automated agent" is "software that interfaces with a business intelligence system to provide automated version control to a business intelligence artifact."[2] The parties dispute whether the recited "automated agent" should be further construed to include "wherein such version control automatically functions without an approval process," as Plaintiff proposes. Plaintiff contends that during prosecution of the '678 Patent, the patentee clarified that "certain method steps are independently and automatically performed by an automated agent … without an approval process." (Dkt. #43 at p. 11-12) (quoting Dkt. #43, Ex. 2 at pp. 3-4). Plaintiff further argues that the prosecution statements regarding the term "automated agent" are entirely consistent with various disclosures in the specification of the '678 Patent (Dkt. #43 at p. 12) (citing '678 Patent at 2:16–19, 3:41–44, 4:18–20, and 4:29–36). Plaintiff contends that its construction properly recognizes that "automated" equates to "automatically functions without an approval process" and is supported by the intrinsic evidence (Dkt. #43 at p. 13).

Defendants respond that the prosecution history statement did not involve the interpretation of the term "automated agent," nor does it constitute any form of disclaimer

---

[2] The Court notes that on November 29, 2013, the Patent Trial and Appeal Board of the U.S. Patent Office ("the PTAB") issued a decision on the petition for *Inter Partes* Review of the '678 Patent ("the IPR") filed by Defendants. In the decision, the PTAB construed the term "automated agent" as "software that interfaces with a business intelligence system to provide automated version control to a business intelligence artifact." (Dkt. #45, Ex. 3 at p. 4).

justifying the incorporation of this additional element into the claims (Dkt. #45 at p. 22). Defendants argue that even if the phrase "without an approval process" was intended to modify "automated agent," as opposed to an "external automatic version control system," this is not an unambiguous disavowal of claim scope that would justify incorporating this additional limitation into the claims (Dkt. #45 at p. 22). Defendants further argue that the prosecution statement did not render the claims allowable, indicating that the examiner appropriately put no weight on Plaintiff's argument relating to "without an approval process" (Dkt. #45 at p. 22). Defendants contend that additional amendments were made after an interview with the examiner, and the Notice of Allowance is silent with regards to the language Plaintiff now seeks to add to the claim (Dkt. #45 at p. 22) (citing Dkt. #45, Ex. 2).

Plaintiff replies that the addition of the clarifying phrase "wherein such version control automatically functions without an approval process" will assist the jury and is consistent with the intrinsic evidence (Dkt. #49 at p. 8). Plaintiff further argues that it would be error to apply the PTAB's construction without first determining the "ordinary and customary meaning" in light of all appropriate intrinsic and extrinsic evidence (Dkt. #49 at p. 8). Plaintiff contends that when the claim language, specification, prosecution history, and appropriate dictionary definitions are properly considered, it becomes clear that the clarifying phrase "wherein such version control automatically functions without an approval process" is the "ordinary and customary meaning" (Dkt. #49 at p. 8).

Plaintiff argues that in direct response to the Advisory Action, application claim 1 (issued claim 1) was amended, in part, to read "… providing an automated agent that interfaces with the business intelligence system to provide automated version control to the business intelligence artifact; the automated agent independently performing the steps of: …" (Dkt. #49 at p. 9) (citing

Dkt. #49, Ex. 2 at p. 8). Plaintiff also contends that application claim 8 (issued claim 4) was amended, in part, to read "… providing an automated agent that interfaces with the business intelligence system; and at a predetermined interval, the automated agent independently performing the steps of: …" (Dkt. #49 at p. 9) (citing Dkt. #49, Ex. 2 at p. 10). Plaintiff further contends that the series of remarks accompanying the claim amendments is a textbook case of such an unambiguous disavowal (Dkt. #49 at p. 10). According to Plaintiff, the patentability was emphatically argued based on the "automated agent" acting "without an approval process," in a "behind the scenes, transparent and automatic method," and "without human intervention" (Dkt. #49 at 11).

Defendants reply that there is no discussion of approval processes (or lack thereof) in the patent specification, and it is anything but clear what the language "without an approval process" is intended to mean (Dkt. #55 at p. 9). According to Defendants, there is no way to discern the scope of a claim that requires functioning "without an approval process" when the specification and prosecution history are devoid of any description of such an "approval process" (Dkt. #55 at p. 9). Defendants further contend that the arguments during prosecution were made in the context of claim language directed to an "external version control system," language that was in a different set of claims that the patentees eventually abandoned during prosecution (Dkt. #55 at p. 10). Defendants also contend that there is no indication in the prosecution history that the examiner placed any weight on applicant's argument concerning an "external version control system (claim 23) without an approval process" (Dkt. #55 at p. 10) (citing Dkt. #45, Ex. 2 at p. 10). Defendants further argue that the claims concerning an "external version control system" were abandoned, additional amendments were made to the remaining claims after an interview with the examiner, and the examiner's Notice of Allowance is silent with regards to anything

functioning "without an approval process" (Dkt. #55 at p. 10).

Defendants also argue that the language "automatically functioning without an approval process" is utterly confusing, finds no support in the specification, and would be unhelpful to a jury (Dkt. #55 at p. 10). Defendants argue that there is no discussion of approval processes or lack thereof in the intrinsic record, except for the argument that Plaintiff now relies upon (Dkt. #55 at p. 10). Defendants also argue that the PTAB's construction, which Defendants and Plaintiff both endorse, is premised on the specification of the patent (Dkt. #55 at p. 10). Defendants argue that if the prosecution history contained a relevant and unambiguous disavowal of claim scope, then the Court could accordingly adopt a narrower construction different from that of the PTAB (Dkt. #55 at p. 10).

Finally, Defendants contend that this is not a "textbook case" of an unambiguous disavowal of claim scope that necessitates a narrowing construction as Plaintiff asserts (Dkt. #55 at p. 11). Defendants argue that the cited argument falls far from meeting the high standard of a "clear and unambiguous disavowal" and was not relied upon by the examiner in allowing the claims (Dkt. #55 at p. 11). According to Defendants, a confusing and unsupported argument made during prosecution cannot be the basis for a "clear and unambiguous disavowal" of claim scope (Dkt. #55 at p. 12).

For the following reasons, the Court finds that the term **"automated agent"** should be construed to mean **"software that interfaces with a business intelligence system to provide automated version control to a business intelligence artifact."**

### b) Analysis

The term "automated agent" appears in claims 1-4 and 7-10 of the '678 Patent. The Court finds that the term is used consistently in the claims and is intended to have the same

meaning in each claim.  The parties agree that the term "automated agent" should be construed to mean "software that interfaces with a business intelligence system to provide automated version control to a business intelligence artifact."  The Court finds that this is consistent with the claim language.  For example, claim 1 recites "an automated agent that interfaces with the business intelligence system to provide automated version control to the business intelligence artifact."  Accordingly, the Court adopts this portion of the parties' construction.

The parties dispute whether the patentee made a clear and an unambiguous disavowal of claim scope in the prosecution history.  Specifically, in response to an advisory action the patentee made the following statement:

> Applicants appreciate the guidance provided in the Advisory Action and hereby submit clarifying amendments to rejected independent claims 1, 16 and 23 to specify that certain method steps are independently and automatically performed by an automated agent (claims 1 and 16) or an external automatic version control system (claim 23) without an approval process. Applicants respectfully submit that the methods of independent claims 1, 16 and 23 clearly distinguish over the Cohen methods. In particular, the claimed methods involve no guards for allowing or denying modifications to an original version, no approval processes for accepting or rejecting modified versions, no staging area for a new version until it has been fully completed and approved, no concept of active and inactive versions, and no management of child business objects.  Instead, the claimed methods involve behind the scenes, transparent and automatic methods of capturing all historical versions of a business intelligence artifact as changes are made and providing a complete revision history. In contrast to the Cohen method of 'activating' a modified business object only after it has been fully completed and approved, the claimed methods rely on an automated agent or an external automatic version control system to independently and automatically record a new revision of a business intelligence artifact whenever a modification to that business intelligence artifact is detected. All of the historical versions of the business intelligence artifact are available to users of the business intelligence system. Further, the claimed methods automatically commit each new revision of the business intelligence artifact to a version control repository, thereby providing stakeholders with visibility into changes made to these business intelligence artifacts and the re-assurance that they can always roll back to an earlier version of a business intelligence artifact."
> . . .
> Applicants respectfully submit that the method of independent claim 8, as amended, clearly distinguishes over the Savage methods. In particular, the Savage

concept of version control in a software development context, which requires a user deliberately committing a new revision of software code to a version control system, fails to anticipate the claimed method for providing automatic version control to a report specification using an automated agent that acts independently and automatically without human intervention to monitor for modifications to the report specification, and if modifications are detected, automatically recording the modified version as a new revision in the version control system.

(Dkt. #49, Ex. 2 at pp. 3-6). Plaintiff focuses on certain words from this statement and argues that it warrants including "without an approval process" in the construction. The Court is not persuaded by Plaintiff's argument, and agrees with Defendants that if there was a clear and unambiguous disclaimer, it would necessarily need to include all of the statements made by patentees' in the Office Action response. Moreover, the Court finds that the amendments made to the claims in the Office Action response succinctly capture the patentees' statement.

Specifically, the patentee amended application claim 1 (issued claim 1) to read "… providing an **automated** agent that interfaces with the business intelligence system to provide automated version control to the business intelligence artifact; **the automated agent independently performing the steps of:** …" (Dkt. #49, Ex. 2 at p. 8) (emphasis in original, reflecting claim amendments). Similarly, application claim 8 (issued claim 4) was amended, in part, to read "… **providing an automated agent that interfaces with the business intelligence system**; and at a predetermined interval, **the automated agent independently performing the steps of:** …" (Dkt. #49, Ex. 2 at p. 10) (emphasis in original, reflecting claim amendments). Accordingly, the Court finds that the claim language indicates how the "automated agent" functions. That is, the recited "automated agent" "independently" performs the recited steps.

Turning to the parties' construction, Plaintiff argues that in making the above arguments and amendments, the patentee made a clear and unambiguous disclaimer of claim scope. Specifically, Plaintiff contends that the patentee limited the claims to version control that automatically functions without an approval process. As discussed above, the Court disagrees

that the patentees' statement requires reading "without an approval process" into the claims. To be sure, the patentees amended the claims to recite that the "automated agent" performs the steps "independently." The claim language is clear and Plaintiff fails to convince the Court that additional language is warranted. Indeed, Plaintiff only focuses on a few words from the prosecution history without explaining why the other statements made by the patentees are not equally as applicable (Dkt. #49, Ex. 2 at pp. 3-6).

Defendants contend that this is not a "textbook case" of an unambiguous disavowal of claim scope that necessitates a narrowing construction. Defendants argue that this is a confusing and unsupported argument, and that the examiner accorded it no weight (Dkt. #55 at p. 12). The Court agrees that Plaintiff's "without an approval process" language is unwarranted. As indicated above, the Court finds that the claim language accurately captures the statements made by the patentees. In summary, the Court is not convinced that the claim language should be confused by the addition of Plaintiff's proposed "without an approval process."

### c) Court's Construction

In light of the evidence submitted by the parties, the Court construes the term **"automated agent"** to mean **"software that interfaces with a business intelligence system to provide automated version control to a business intelligence artifact."**

### 2. "automatic / automated version control"

| Disputed Term | Plaintiff's Proposal | Defendants' Proposal |
|---|---|---|
| "automatic / automated version control" | No construction necessary | "any form of version control implemented through software" |

### a) The Parties' Positions

The parties dispute whether the terms "automatic version control" and "automated version control" require construction. Plaintiff contends that the terms do not require

construction and that Defendants' construction is an improper attempt to define the term "automatic/automated" as "implemented through software" (Dkt. #43 at p. 14). Plaintiff argues that Defendants' construction uses the term "version control" in its definition of a claim term that already includes the term "version control" (Dkt. #43 at p. 14). Plaintiff argues that this shows that Defendants' construction is meaningless, completely unnecessary, and wrong (Dkt. #43 at p. 14). Plaintiff contends that the term "automatic / automated version control" is not so broad as to encompass any type of version control implemented through software (Dkt. #43 at p. 14). Plaintiff argues that the details of how the version control is "automatic / automated" are carefully set forth in the context of the surrounding claim language and cannot be ignored or rewritten by Defendants (Dkt. #43 at p. 14).

Defendants respond that while the specification is replete with reference to "automatic version control," it is silent with respect to what "automatic" actually means in a software context (Dkt. #45 at p. 23). Defendants argue that since all software is designed to automate tasks, "automatic version control" should be interpreted as "any form of version control implemented through software" (Dkt. #45 at p. 23). Defendants contend that this is consistent with the commonly understood meaning of "automatic" (Dkt. #45 at p. 23).

Defendants further argue that this is also consistent with the patent examiner's understanding of the claims during prosecution (Dkt. #45 at p. 23). Defendants contend that the patentees argued that a prior art reference did not teach "automatically" recording a new version of a business intelligence artifact or "creating business intelligence artifacts" in an attempt to overcome the Cohen prior art reference (Dkt. #45 at p. 24) (citing Dkt. #45, Ex. 2 at p. 22). Defendants argue that the examiner understood that "automatic" version control meant nothing more than providing version control via software (*e.g.*, via a "state machine" as disclosed in the

prior art) (Dkt. #45 at p. 24) (citing Dkt. #45, Ex. 2 at p. 22).

Plaintiff replies that the PTAB expressly rejected Defendants' construction by stating that "automatic nature of the agent is deemphasized by BSP's proposed construction" (Dkt. #49 at p. 12) (citing Dkt. #49, Ex. 1 at p. 6). Plaintiff argues that Defendants' construction is another attempt to deemphasize the automatic nature of the claimed invention (Dkt. #49 at p. 12). Plaintiff contends that Defendants' construction reads out "automatic / automated" from the terms (Dkt. #49 at p. 12). Plaintiff also argues that Defendants' citation of the examiner's comments regarding a "state machine" is misguided (Dkt. #49 at p. 12). Plaintiff contends that the examiner's comments were in an Advisory Action explaining that the patentees' arguments regarding "automatically" were not sufficient because there was not corresponding claim language (Dkt. #49 at p. 12). Plaintiff argues that in response to the examiner's statement, application claim 1 (issued claim 1) and application claim 8 (issued claim 4) were amended in a manner that emphasized that the version control was automated and achieved using an automated agent (Dkt. #49 at pp. 12-13).

Plaintiff further argues that the dispute over construction of "automatic / automated version control" is not whether the claimed invention is implemented through software (Dkt. #49 at p. 13). Plaintiff contends that the dispute instead centers on Defendants' attempt to completely eliminate the term "automatic" by defining it as "any form" of version control implemented through software (Dkt. #49 at p. 13). Plaintiff argues that the PTAB correctly recognized and rejected Defendants' first attempt at deemphasizing the automatic nature of the claimed invention (Dkt. #49 at p. 13). Plaintiff contends that a person of ordinary skill would simply look to the context of the claim to determine the scope and meaning of the term (Dkt. #49 at p. 13).

Defendants reply that Plaintiff still does not explain what it believes "automatic / automated version control" means and does not propose an alternative construction (Dkt. #55 at p. 12). Defendants further argue that the PTAB did not construe, or even discuss construction of, the term "automated / automatic version control" (Dkt. #55 at p. 13). Defendants contend that the PTAB's discussion cited by Plaintiff was with regards to Defendants' then-proposed construction that "automated agent" means "any software that actively performs version control." (Dkt. #55 at p. 13). Defendants argue that the PTAB simply rejected Defendants' attempt to narrow the claim to "actively performing" version control in view of the broader "automatic nature" of the claim (Dkt. #55 at p. 13). Defendants further argue that the PTAB did not consider the prosecution history, dictionary definitions, and expert testimony relied upon by Defendant BSP to support its construction of "automated / automatic version control" (Dkt. #55 at p. 14).

Defendants also argue that Plaintiff attempts to minimize the effect of the examiner's discussion by pointing to amendments made later-in-time (Dkt. #55 at p. 14). Defendants contend that the term "automatic version control" was already part of the claim at the time the examiner issued the Advisory Action (Dkt. #55 at p. 14) (citing Dkt. #55, Ex. 2 at pp. 27, 14). Defendants argue that the amendments made in response to the Advisory Action had nothing to do with the purported "automatic" nature of the system (Dkt. #55 at p. 14). Defendants contend that the amendment was directed to user-authored objects that produce output, and not the mere repetition of the word "automated" (Dkt. #55 at p. 14).

Defendants further argue that Plaintiff provides no rebuttal to the testimony of its expert witness, Dr. Dewayne Perry (Dkt. #55 at p. 15). Defendants contend that it is well understood that in the context of computer software, anything done according to the software of a computer

is done in an "automatic" fashion (Dkt. #55 at p. 15).  According to Defendants, the examiner recognized this ordinary and customary meaning during prosecution, it is consistent with the opinions of Dr. Perry, and is supported by the dictionary definition of the word "automatic" (Dkt. #55 at p. 15).

For the following reasons, the Court finds that the terms **"automatic version control"** and **"automated version control"** should be given their **plain and ordinary meaning**.

### b) Analysis

The term "automatic version control" appears in claims 1 and 4 of the '678 Patent.  The term "automated version control" appears in claim 1 of the '678 Patent.  The Court finds that the term is used consistently in the claims and is intended to have the same meaning in each claim. The Court further finds that the term "automatic version control" and "automated version control" are unambiguous and are easily understood by a jury.

For example, claim 1 recites that "automated version control" includes the steps of "automatically storing the initial version of the business intelligence artifact with a version control system" and "automatically storing the subsequent version of the business intelligence artifact in the version control system."  Likewise, the specification states that "[t]he invention also employs version control, which is used to automatically record versions of business intelligence artifacts, including report specifications, metadata models, and analysis cubes." '678 Patent at 2:16–19.  Accordingly, the Court finds that a person of ordinary skill in the art would understand "automated version control" when considered in the context of the claims and the intrinsic evidence.

Turning to Defendants' construction, the Court finds that it is overly broad and not consistent with the intrinsic evidence.  The Court agrees with Plaintiff that Defendants'

construction reads the term "automatic" or "automated" out of the claims and replaces it with "any form . . . implemented through software." "Any form" would include software that runs automatically, as well as software that requires human input to execute. This is extremely broad and is inconsistent with the prosecution history. Specifically, in an Advisory Action the examiner stated the following:

> Examiner appreciates the interpretation description given by Applicant in response. Applicant discloses "(1) automatically recording a new version of a business intelligence artifact whenever a modification to that business intelligence artifact is detected; and (2) creating business intelligence artifacts," *however there are no description or language indicative of limiting the interpretation of this limitations.* Therefore, the limitations can be interpreted as (i.e., The present invention uses a state machine to represent a business process and manages the versioning of business objects associated with the business process.)

(Dkt. #55, Ex. 2 at p. 24) (emphasis added). Defendants contend that this indicates that the examiner understood that "automatic" version control meant nothing more than providing version control via software (e.g. via a "state machine" as disclosed in the prior art). The Court disagrees. As indicated above, the examiner noted that although the patentee discloses "automatically recording a new version of a business intelligence artifact whenever a modification to that business intelligence artifact is detected," there was "no description or language indicative of limiting the interpretation of this limitations." (Dkt. #55, Ex. 2 at p. 24).

Indeed, the examiner stated that "[a]lthough applicant's claims are not currently in a state of allowance, if applicant's invention can be claimed in a more limited or less broad manner, applicants may avail themselves of the procedures whereby further examination can be request." (Dkt. #55, Ex. 2 at p. 24). In other words, the examiner concluded that the scope of the claim could include "any form" of software (*e.g.*, a state machine) and was not limited to an "automatic version control." Indeed, in response to the Advisory Action, the patentee amended

application claim 1 (issued claim 1) and application claim 8 (issued claim 4) in a manner that emphasized that the version control was automated and achieved using an automated agent (Dkt. #55, Ex. 2 at pp. 14, 16). Defendants' construction of "any form" of software is inconsistent with the prosecution history and how a person of ordinary skill in the art would interpret the term.

This is further indicated by the PTAB's rejection of Defendants' construction for the related term of "automated agent." Specifically, the PTAB stated the following:

> More important to the construction is the "automatic" nature of the "automated agent." Claim 1, for example, refers to the automated agent "independently performing the steps," and "automatically storing" versions "to provide automated version control." Claim 4 recites similar language and, in part, recites that the automated agent monitors the system for modifications and records the modified version "if modifications to the business intelligence artifact are detected."

> BSP's construction provides for an agent that "actively performs version control," but we are not persuaded that "active" is synonymous with "automatic." In the context of the Specification of the '678 Patent, the invention provides a system "to continuously monitor, verify and report on the business intelligence software." Ex. 1001 4:31-32. This automatic nature of the agent is deemphasized by BSP's proposed construction.

(Dkt. #49, Ex. 1 at p. 6). Consistent with the PTAB's analysis, the Court agrees that Defendants' construction would not only deemphasize, but potentially eliminate "automatic" or "automated" from the claims. To be clear, the dispute is not whether software is used to provide version control, because the Court finds that software is required to perform the version control. Instead, the dispute is whether the version control is provided "automatically" by the software. Accordingly, the Court finds that Defendants' construction is not consistent with how a person of ordinary skill in the art would interpret the terms "automatic version control" and "automated version control." Finally, the Court has considered the extrinsic evidence submitted by

Defendants, and given it its proper weight in light of the intrinsic evidence.

### c) Court's Construction

In light of the evidence submitted by the parties, the terms **"automatic version control"** and **"automated version control"** will be given their **plain and ordinary meaning.**

### 3. "report specification" / "analysis cube"

| Disputed Term | Plaintiff's Proposal | Defendants' Proposal |
|---|---|---|
| "report specification" | No construction necessary | "any data structure capable of representing a report, including data structures known as report specifications, report definitions, report template, report designs and example reports" |
| "analysis cube" | No construction necessary | "any type of analytical processing cube or any other form of three dimensional data structure used to analyze data, such as an On-Line Analytical Processing (OLAP) cube" |

### a) The Parties' Positions

The parties dispute whether the terms "report specification" and "analysis cube" require construction. Plaintiff contends that each of these terms is easily understood by a person of ordinary skill in the art, especially when considered in the context of the surrounding claim language, the specification, and the prosecution history of the '678 Patent (Dkt. #43 at p. 15). Plaintiff argues that the claim language itself makes clear that the terms "report specification" and "analysis cube" are not simply data structures (Dkt. #43 at p. 15). Plaintiff contends that each must fall within a group of business intelligence artifacts that are (i) user-authored and (ii) executable in a business intelligence system (iii) to produce output based upon business metric data (Dkt. #43 at p. 15). Plaintiff contends that Defendants' constructions ignore the fact that both "report specification" and "analysis cube" are members of the group of "business intelligence artifacts" having the characteristics expressly defined by the claim language (Dkt.

#43 at p. 16).

Plaintiff further contends that the scope of Defendants' construction extends beyond what would be included in the group of "business intelligence artifacts" (Dkt. #43 at p. 16). Plaintiff argues that Defendants' construction would include report specifications and analysis cubes that are not user-authored, are not executable in a business intelligence system, and do not produce output (Dkt. #43 at p. 16). Plaintiff further argues that the prosecution history of the '678 Patent further emphasizes that the terms "report specification" and "analysis cube" must be members of a group of business intelligence artifacts that are user-authored, executable in a business intelligence system, and produce output (Dkt. #43 at p. 16) (citing '678 File History, page 171).[3] Plaintiff also contends that the specification provides still more reason to reject Defendants' construction (Dkt. #43 at p. 17) (citing '678 Patent at 2:17–19, 3:5–32, 1:43–50, and 1:62–65).

Defendants respond that the terms are entitled to their ordinary and customary meaning to one of ordinary skill in the art, but that meaning may not be understood by a lay jury unfamiliar with business intelligence systems (Dkt. #45 at p. 25). Defendants argue that one of ordinary skill in the art would understand "report specification" to include report formats, report definitions, report templates, report designs and example reports, while an "analysis cube" refers to any type of analytical processing cube or any other form of three-dimensional data structure used to analyze data, such as an On-Line Analytical Processing (OLAP) cube (Dkt. #45 at p. 26) (citing Dkt. #45, Ex. 4 at ¶¶ 26-27).

Defendants argue that their construction makes clear the sort of items generally understood in the industry as meaning a "report specification" or "analysis cube" (Dkt. #45 at p. 26). Defendants contend that their constructions are consistent with business intelligence artifacts that are user-authored, executed by a business intelligence system, and which generate

---

[3] It does not appear that this page was included in the exhibits submitted to the Court.

output (Dkt. #45 at p. 26). Defendants argue that an example report is user authored, is executed by a business intelligence system, and generates output (Dkt. #45 at p. 26). Defendants contend that the same is true for all the examples recited in their constructions, including an OLAP cube (Dkt. #45 at p. 26). Defendants further argue that the requirements that the business intelligence artifact be user-authored, executed, and that it generate output are already other elements of the claims (Dkt. #45 at p. 26).

Plaintiff replies that the parties agree that each of "report specification" and "analysis cube" is a claimed example of a "business intelligence artifact" (Dkt. #49 at p. 13). Plaintiff contends that Defendants' constructions omit any reference to "the production of output when executed in the business intelligence system," as found necessary by the PTAB (Dkt. #49 at p. 14). Plaintiff further argues that Defendants' construction for "report specification" is defined to include "report specifications" plus more (Dkt. #49 at p. 15). Plaintiff contends that Defendants' construction implicitly admits that report definitions, report templates, report designs, and example reports are different than report specifications (Dkt. #49 at p. 15). Plaintiff also argues that Defendants' construction for "analysis cube" is defined to include "any type of analytical processing cube" plus more (Dkt. #49 at p. 15). Plaintiff argues that Defendants' construction uses the similar language "analytical processing cube" but then broadens to include "or any other form of three dimensional data structure used to analyze data" (Dkt. #49 at p. 15). Plaintiff contends that Defendants fail to offer any intrinsic evidence to support their attempt at broadening the scope (Dkt. #49 at p. 15).

Plaintiff further argues that Defendants' constructions also introduce new terms that appear nowhere in the specification or prosecution history of the '678 Patent (Dkt. #49 at p. 15). Plaintiff contends that rather than clarifying the terms "report specification" and "analysis cube,"

the new terms in Defendants' constructions would themselves require construction (Dkt. #49 at p. 15).  Plaintiff further argues that Defendants' constructions provide no additional guidance to the jury, but instead provide Defendants the opportunity to include other terms not necessarily included within the scope of the disputed terms (Dkt. #49 at p. 16).  Plaintiff argues that if a person of ordinary skill had any uncertainty as to the meaning of "report specification" or "analysis cube," they would look to the context of the surrounding claim language, the specification, and the prosecution history of the '678 Patent to determine the scope and meaning thereof (Dkt. #49 at p. 16).

Defendants respond that their construction for "report specification" and "analysis cube" does nothing to diminish the separate and distinct requirement that any business intelligence artifact must produce output when executed (Dkt. #55 at p. 16).  Defendants contend that the specification of the '678 Patent provides no definition for the technical terms "report specification" and "analysis cube" (Dkt. #55 at p. 16).  Defendants argue that their construction is supported by the expert declaration of Dr. Perry, which provides the meaning of the technical terms "report specification" and "analysis cube" in a manner understandable to a lay jury (Dkt. #55 at p. 16).  Defendants contend that the terms "report specification" and "analysis cube" on their own do not provide guidance to the Court or a jury (Dkt. #55 at p. 17).

Defendants also contend that Plaintiff does not seriously contest the technical accuracy of their constructions (Dkt. #55 at p. 17).  Defendants argue that the words in their construction are easily understood and known to those in the art, and are collectively more easily understood by a lay jury as opposed to the terms "report specification" and "analysis cube" in isolation (Dkt. #55 at p. 17).  Defendants further argue that Plaintiff's objection to the using "report specification" and "analysis cube" as examples could be easily addressed by removing these examples from the

proposed construction, rather than foregoing any construction whatsoever (Dkt. #55 at p. 17).

For the following reasons, the Court finds that the term **"report specification"** should be construed to mean **"a user-authored object that specifies the content and structure used to produce an output when executed in a business intelligence system."** The Court also finds that the term **"analysis cube"** should be construed to mean **"a user-authored object that includes multi-dimensional data structure used to produce an output when executed in a business intelligence system."**

### b)  Analysis

The term "report specification" appears in claims 1 and 4 of the '678 Patent. The Court finds that the term is used consistently in the claims and is intended to have the same meaning in each claim. The term "analysis cube" appears in claims 1 and 4 of the '678 Patent. The Court finds that the term is used consistently in the claims and is intended to have the same meaning in each claim. The Court agrees with Defendants that the terms "report specification" and "analysis cube" on their own do not provide guidance to a jury and require construction. The Court further finds that the intrinsic and extrinsic evidence indicates that the term "report specification" should be construed to mean "a user-authored object that specifies the content and structure used to produce an output when executed in a business intelligence system." Similarly, the Court finds that the term "analysis cube" should be construed to mean "a user-authored object that includes multi-dimensional data structure used to produce an output when executed in a business intelligence system."

Specifically, the intrinsic evidence indicates that business intelligence artifacts include report specifications and analysis cubes. '678 Patent at 2:17–19. The specification further discloses a process for an author to develop a business intelligence artifact that provides the output required by a stakeholder, such as a business consumer. '678 Patent at 3:5–32, Figure 2.

That process may include the author defining test cases containing one or more assertions used to determine whether the business intelligence artifact is functioning properly. *Id.* These assertions may be requirements of the business intelligence artifact before it is run or executed, *i.e.,* pre-execution assertions, and requirements of the business intelligence artifact after it is executed, *i.e.*, post execution assertions. *Id.* Furthermore, the specification discloses that report specifications and analysis cubes are built on top of a metadata layer (model) within the business intelligence system, which provides a business friendly view of one or more data sources. *Id.* Accordingly, the Court finds that the recited "report specification" and "analysis cube" are user-authored object used to produce an output when executed in a business intelligence system.

The extrinsic evidence submitted by Defendants further indicates that a "report specification" specifies the content and structure used to produce an output when executed, and that an "analysis cube" includes multi-dimensional data structure used to produce an output when executed. Specifically, Defendants' expert states that "[d]uring prosecution, the Applicant for the '678 Patent argued that '[a] report specification in a business intelligence system defines the rules for which data sources should be queried, which queries should be issued, how numerical measures should be summarized across dimensions, and how the resultant information should be displayed (e.g. in a pie chart, a bar chart, in a crosstab, etc.) when the report specification is executed.' (Office Action Response filed Oct. 6, 2011 at 15)" (Dkt. #45, Ex. 4 at ¶ 26). This indicates that a "report specification" specifies the content and structure used to produce an output when executed.

Similarly, Defendants' expert opined that "[o]ne of ordinary skill in the art on or around January 3, 2006 would understand that a reference to an 'analysis cube' refers to an analytical processing cube, a popular example being an On-Line Analytical Processing (OLAP) cube. Such

'cubes' allow for the complicated processing of multi-dimensional data sets." (Dkt. #45, Ex. 4 at ¶ 27). This indicates that an "analysis cube" includes multi-dimensional data structure used to produce an output when executed.

Turning to Defendants' constructions, the Court does not adopt Defendants' constructions because they fail to indicate that the "report specification" and "analysis cube" are user-authored objects that produce an output when executed in a business intelligence system. The Court appreciates that this aspect is recited in the claims, but finds that in light of the parties' dispute, this language could be missed by a jury. Indeed, the PTAB stated the following:

> The construction of business intelligence artifact is clear from the claims, but it must be pointed out that the term requires the production of output when executed in the business intelligence system. We also note that the Specification and claims make clear that business intelligence artifacts include "report specifications, metadata models, and analysis cubes," Ex. 1001 2:18-19, each of which may be an electronic document.

(Dkt. #49, Ex. 1 at p. 4). Accordingly, the Court finds that the proper construction for the terms "report specification" and "analysis cube" indicates that they are user-authored objects that produce an output when executed in a business intelligence system.

The Court further finds that Defendants' construction for "report specification" includes "report specification," which is unhelpful and could be confusing to a jury. Likewise, Defendants' construction for "analysis cube" includes "cube," which again is unhelpful and could be confusing to a jury. Defendants argue that this can be remedied by removing these terms from their constructions. The Court is not convinced that would resolve the issue. In addition to repeating these terms, Defendants' constructions include other new terms that appear nowhere in the specification or prosecution history of the '678 Patent. The Court agrees with Plaintiff that these new terms in Defendants' constructions would themselves require construction. Thus, Defendants' constructions further confuse the terms "report specification"

and "analysis cube" rather than clarifying these terms.

Finally, Defendants' construction appears to be so broad that it would cover "any data structure." This would be inconsistent with how a person of ordinary skill in the art would interpret the terms. Indeed, Defendants' expert does not opine that the recited "report specification" could be "any data structure." Instead, he only states that depending on the nomenclature used in the business intelligence system, "a 'report specification' includes report formats, report definitions, report templates, report designs and example reports." (Dkt. #45, Ex. 4 at ¶ 26). Likewise, the PTAB agreed that "a format alone is not sufficient to demonstrate that the object produces output in a specific system, per the construction of 'business intelligence artifact.'" (Dkt. #44, Ex. 1 at p. 17). In addressing Defendants' argument related to prior art, the PTAB stated that "BSP also argues that the hierarchy can hold expressions to be evaluated, *id.*, but, again, that connotes a format that is not sufficient to teach any type of user-authored object that produces output when executed." (Dkt. #44, Ex. 1 at p. 19). Accordingly, the Court does not adopt Defendants' construction because it would appear to include "any data structure," even ones that are not user-authored objects that produce output when executed.

### c) Court's Construction

In light of the evidence submitted by the parties, the Court construes the term **"report specification"** to mean **"a user-authored object that specifies the content and structure used to produce an output when executed in a business intelligence system."** The Court also construes the term **"analysis cube"** to mean **"a user-authored object that includes multi-dimensional data structure used to produce an output when executed in a business intelligence system."**

### 4. "detecting a request … to modify"

| Disputed Term | Plaintiff's Proposal | Defendants' Proposal |
|---|---|---|
| "detecting a request … to modify" | No construction necessary | "detecting that a request to modify has been made by polling the artifact" |

### a) The Parties' Positions

The parties dispute whether the phrase "detecting a request … to modify" requires construction.[4]  Plaintiff contends that Defendants proposed construction merely restates the claim phrase ("detecting a request to modify") and tacks on an additional limitation ("that … has been made by polling the artifact") (Dkt. #43 at p. 18).  Plaintiff argues that no construction is necessary for the claim phrase "detecting a request … to modify" because the language is understood by those of ordinary skill in the art (Dkt. #43 at p. 19).  Plaintiff contends that the intrinsic evidence refutes Defendants' attempt to import a "polling" limitation into the claims (Dkt. #43 at p. 19).  Plaintiff argues that no disavowal of claim scope is made anywhere in the intrinsic evidence (Dkt. #43 at p. 19).  Plaintiff further argues that nowhere in claim 1 or 7 does the term "polling" or anything similar appear (Dkt. #43 at p. 19).  According to Plaintiff, if the "detecting a request … to modify" claim phrase was intended to be limited to a "polling" or "predetermined interval," then the patent applicant would have so stated (Dkt. #43 at p. 19).

Plaintiff further argues that the specification of the '678 Patent contains no disavowal of claim scope that properly limits "detecting a request … to modify" to just a "polling" technique (Dkt. #43 at p. 20).  Plaintiff contends that the specification makes clear that a broader scope of "detecting a request … to modify" was intended (Dkt. #43 at p. 20) (citing '678 Patent at Figure 2, 1:17–24, 3:41–44, 4:17–20, and 4:34–36).  Plaintiff argues that the "polling" limitation

---

[4] Defendants contend that claims 1-3 are limited to "detecting that a request to modify has been made by polling the artifact," or if not, are invalid under 35 U.S.C. § 112 ¶ 1.  The Court will address Defendants' invalidity arguments in a separate order.  In the interest of brevity, the Court will not restate the arguments related to the invalidity issue, but it should be understood that the Court has considered all arguments presented by the parties as they relate to invalidity and claim construction.

appears nowhere in the claims and no disavowal of claim scope is present in the intrinsic evidence (Dkt. #43 at p. 21).

Defendants respond that the only systems disclosed in the specification are those directed to continuously / repeatedly testing business intelligence artifacts, and detecting changes that have been made–according to a predetermined interval (*i.e.*, "polling" the artifact at a predetermined interval) (Dkt. #45 at p. 13). Defendants argue that the only support Plaintiff points to is the disclosure in the specification for continuously monitoring business intelligence artifacts by testing them (Dkt. #45 at p. 13). Defendants also argue that claim differentiation does not apply and cannot be used to expand a claim beyond its proper scope (Dkt. #45 at pp. 13-14). Finally, Defendants contend that there is plainly a dispute between the parties with regards to the meaning of this term that mandates a construction (Dkt. #45 at p. 14).

Plaintiff responds that Defendants have presented nothing to rebut the fact that the intrinsic evidence refute Defendants' attempt to import a "polling" limitation into the claim phrase "detecting a request … to modify" (Dkt. #49 at p. 17). Plaintiff also argues that Defendants make a false and unsupported conclusion that the terms "continuously," "repeatedly," and "predetermined interval" are interchangeable, and that each term is synonymous with a "polling" technique (Dkt. #49 at p. 17). Plaintiff further contends that Defendants' argument about the doctrine of claim differentiation is a straw man argument that was not asserted by Plaintiff (Dkt. #49 at p. 18). Plaintiff argues that it simply notes that independent claim 4 expressly states "at a predetermined interval," and if it had intended independent claim 1 to be so limited, it would have used similar language (Dkt. #49 at p. 18).

Defendants reply that Plaintiff does not rebut the fact that the specification provides no support for this claim term (Dkt. #55 at p. 7). Defendants further contend that they did not argue

that terms "continuously," "repeatedly," and "predetermined interval" are interchangeable (Dkt. #55 at p. 7). Defendants argue that it was Plaintiff that pointed to "continuously monitoring" as providing some form of support for "detecting a request … to modify" in an attempt to identify support for the disputed claim language in its opening claim construction brief (Dkt. #55 at p. 7).

Defendants also argue that Plaintiff does not dispute that the specification of the '678 Patent only discloses two different types of systems (Dkt. #55 at p. 8). Defendants argue that the first one "continuously monitors" business intelligence artifacts by repeatedly testing them to detect errors (without regard to any version control functionality), and the other one provides version control by saving artifacts at predetermined intervals (Dkt. #55 at p. 8). Defendants contend that neither provides written description support for the broad claim as drafted, which merely requires "detecting a request … to modify" an artifact (Dkt. #55 at p. 8). Defendants argue that both the system directed to testing artifacts and the system that saves artifacts at predetermined intervals constitute examples of polling an artifact (Dkt. #55 at p. 8). According to Defendants, their construction does not simply limit the claim to a specific embodiment but rather encompasses all possible embodiments that find support in the specification (Dkt. #55 at p. 8).

For the following reasons, the Court finds that the phrase **"detecting a request … to modify"** should be given its **plain and ordinary meaning.**

### b) Analysis

The phrase "detecting a request … to modify" appears in claims 1 and 7 of the '678 Patent. The Court finds that the phrase is used consistently in the claims and is intended to have the same meaning in each claim. The Court further finds that the intrinsic evidence indicates that the phrase should not be limited as Defendants propose. It is undisputed that the

specification explicitly discloses automatic version control, and that in the preferred embodiment the automatic version controls operates on a predetermined time interval. Specifically, the specification states that "[t]he source control system records and saves the artifacts at a predetermined time interval that may be established to run every thirty (30) minutes, every hour, or at any other interval determined by the stake holders of the business intelligence environment." '678 Patent at 3:44–48. This embodiment is captured in claim 4, which recites "at a predetermined interval." The Court notes that this language does not appear in claim 1. This indicates that the patentee did not intend to limit claim 1 to the predetermined interval, as Defendants propose. Thus, the Court finds that claim 1 should not be limited to this embodiment. Moreover, the Court finds that the phrase "detecting a request … to modify" is unambiguous, is easily understandable by a jury, and requires no construction. Accordingly, the Court finds that this phrase should be given its plain and ordinary meaning.

Turning to Defendants' construction, Defendants argue that the only embodiment disclosed in the specification is one that saves artifacts at predetermined intervals, and therefore the claims should be limited to this disclosed embodiment (Dkt. #55 at p. 8). The Court disagrees. Defendants do not point to any evidence in the prosecution history that would indicate that the patentee disclaimed other types of version control. Instead, the specification explicitly states that "[a]lthough preferred embodiments of the invention have been illustrated in the accompanying Drawings and described in the foregoing Summary and Detailed Description, it will be understood that the invention is not limited to the embodiments disclosed, but is capable of numerous rearrangements, modifications, and substitutions of parts and elements without departing from the spirit of the invention." '678 Patent at 4:37–43. Moreover, it is well established that it is impermissible to import limitations into claims from examples in the

specification unless the specification and/or prosecution history makes very clear that the patent intended such limitation. *See, e.g.*, *JVW Enters., Inc. v. Interact Accessories, Inc.*, 424 F.3d 1324, 1335 (Fed. Cir. 2005) ("We do not import limitations into claims from examples or embodiments appearing only in a patent's written description, even when a specification describes very specific embodiments of the invention or even describes only a single embodiment . . ."); *Alloc, Inc. v. Int'l Trade Comm'n,* 342 F.3d 1361, 1370 (Fed. Cir. 2003) ("[I]t is impermissible to read the one and only disclosed embodiment into a claim without other indicia that the patentee so intended to limit the invention."). Accordingly, the Court does not adopt Defendants' construction.

### c) Court's Construction

In light of the evidence submitted by the parties, the phrase **"detecting a request … to modify"** will be given its **plain and ordinary meaning.**

### IV.    CONCLUSION

The Court adopts the above constructions. The parties are ordered that they may not refer, directly or indirectly, to each other's claim construction positions in the presence of the jury. Likewise, the parties are ordered to refrain from mentioning any portion of this opinion, other than the actual definitions adopted by the Court, in the presence of the jury. Any reference to claim construction proceedings is limited to informing the jury of the definitions adopted by the Court.

**IT IS SO ORDERED.**
**SIGNED this 21st day of August, 2015.**


_____
AMOS L. MAZZANT
UNITED STATES DISTRICT JUDGE