# United States District Court
### EASTERN DISTRICT OF TEXAS
### SHERMAN DIVISION

| | | |
|---|---|---|
| MOTIO, INC. | § | |
| | § | |
| V. | § | CASE NO. 4:12-CV-647 |
| | § | Judge Mazzant |
| BSP SOFTWARE LLC, | § | |
| BRIGHTSTAR PARTNERS, INC., | § | |
| and AVENT, INC. | § | |

## **MEMORANDUM OPINION**

Pending before the Court is Defendants' Renewed Motion for Partial Summary Judgment of Invalidity Under 35 U.S.C. § 112 ¶ 1 (Dkt. #89). On July 29, 2015, the Court heard arguments from the parties. After having considered the motion and the relevant pleadings, the Court finds that Defendants' motion should be **DENIED**.

## BACKGROUND

Plaintiff asserts that Defendants infringe claims 1-4 and 7-10 of U.S. Patent No. 8,285,678 ("the '678 Patent"). The '678 Patent is titled "Continuous integration of business intelligence software." It was filed on December 30, 2010, and issued on October 9, 2012. The '678 Patent relates to methods of providing automatic version control to a business intelligence system. '678 Patent at Abstract. Business intelligence systems are used to gather, store, analyze, and report on business metric data, such as factory production, personnel productivity in a manufacturing facility, or trends in sales in a retail store environment. *Id.* at 1:28–35. The specification states that "[t]he purpose of the invention is to continuously monitor, verify, and report on the business intelligence software." *Id.* at 4:31–32. The specification adds that "[t]his is done via an automated agent that executes one or more test cases that are comprised within a test suite." *Id.* at 4:32–34. The specification further states that "[t]he invention also automatically stores versions of the work done by the business intelligence software user." *Id.* at

1

4:34–36. The specification indicates that "[t]he method utilizes a source control system to record and maintain current and historical versions of the business intelligence artifacts during the development or revision of the business intelligence artifacts." *Id*. at 3:41–44.

The '678 Patent is a continuation of U.S. Patent No. 7,885,929 ("the '929 Patent"). The '929 Patent was filed on January 3, 2006. The '929 Patent and '678 Patent share a nearly identical specification, except for the Abstract. Claim 1 of the '929 Patent follows:

> 1. In a general purpose computer, a method for automatically and continuously testing the accuracy and consistency of a business intelligence artifact, comprising:
> a. receiving business metric data from a business intelligence system;
> b. creating a business intelligence artifact derived from the received business metric data;
> c. formatting the created business intelligence artifact based upon at least one request for a business intelligence artifact by a user;
> d. creating at least one test case for the formatted business intelligence artifact, the at least one test case having at least one assertion condition to verify that the business intelligence artifact is still functioning properly before the business intelligence artifact is executed to create a business intelligence output populated with information related to the business metric data;
> e. automatically recording current and previous versions of the business intelligence artifact at a first interval with a source control system;
> f. testing, with an automated agent interfaced with the business intelligence system, the business intelligence artifact for errors based upon the request by the user, the testing performed at a second interval by determining whether the current version of the business intelligence artifact satisfies the conditions of the at least one assertion before execution of the business intelligence artifact; and
> g. if errors are detected during the testing, correcting the errors to create a second version of the business intelligence artifact.

As indicated above, claim 1 of the '929 Patent was directed to a system that performed tests, detected errors, and recorded versions at predetermined intervals. Claim 1 of the '678 Patent follows:

> 1. In a general purpose computer, a method for providing

   automatic version control to a business intelligence system, comprising:
    creating an initial version of a business intelligence artifact in the business intelligence system, wherein the business intelligence artifact is a user-authored object that produces output when the business intelligence artifact is executed in the business intelligence system, and wherein the business intelligence artifact is selected from the group consisting of: a report specification and an analysis cube;
    providing an automated agent that interfaces with the business intelligence system to provide automated version control to the business intelligence artifact; the automated agent independently performing the steps of:
    automatically storing the initial version of the business intelligence artifact with a version control system;
    detecting a request to the business intelligence system to modify the initial version of the business intelligence artifact to create a subsequent version of the business intelligence artifact that includes the requested modification; and
    automatically storing the subsequent version of the business intelligence artifact in the version control system.

As indicated above, claim 1 of the '678 Patent was directed to a system that provides version control by "detecting a request … to modify" a business intelligence artifact. Defendants contend that no such system is described in the specification of the '678 Patent or the '929 Patent (Dkt. #89 at p. 8). Thus, Defendants move for summary judgment, asserting that claims 1, 2, and 3 of the '678 Patent are invalid for lack of written description.

## LEGAL STANDARDS

*Summary Judgment*

  The purpose of summary judgment is to isolate and dispose of factually unsupported claims or defenses. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986). Summary judgment is proper if the pleadings, the discovery and disclosure materials on file, and any affidavits "[show] that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute about a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The trial court must resolve all reasonable doubts in favor of the party opposing the motion for summary judgment. *Casey Enterprises, Inc. v. American Hardware Mut. Ins. Co.*, 655 F.2d 598, 602 (5th Cir. 1981) (citations omitted). The substantive law identifies which facts are material. *Anderson,* 477 U.S. at 248.

The party moving for summary judgment has the burden to show that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law. *Id.* at 247. If the movant bears the burden of proof on a claim or defense on which it is moving for summary judgment, it must come forward with evidence that establishes "beyond peradventure *all* of the essential elements of the claim or defense." *Fontenot v. Upjohn Co.*, 780 F.2d 1190, 1194 (5th Cir. 1986). But if the nonmovant bears the burden of proof, the movant may discharge its burden by showing that there is an absence of evidence to support the nonmovant's case. *Celotex*, 477 U.S. at 325; *Byers v. Dallas Morning News*, *Inc.*, 209 F.3d 419, 424 (5th Cir. 2000). Once the movant has carried its burden, the nonmovant must "respond to the motion for summary judgment by setting forth particular facts indicating there is a genuine issue for trial." *Byers*, 209 F.3d at 424 (citing *Anderson*, 477 U.S. at 248-49). The nonmovant must adduce affirmative evidence. *Anderson*, 477 U.S. at 257. The Court must consider all of the evidence but refrain from making any credibility determinations or weighing the evidence. *See Turner v. Baylor Richardson Med. Ctr.*, 476 F.3d 337, 343 (5th Cir. 2007).

*Written Description*

"The specification shall contain a written description of the invention" in "full, clear, concise, and exact terms." 35 U.S.C. § 112 ¶ 1. "[T]he purpose of the written description requirement is to 'ensure that the scope of the right to exclude, as set forth in the claims, does not

4

overreach the scope of the inventor's contribution to the field of art as described in the patent specification.'" *ICU Medical, Inc. v. Alaris Medical Sys.*, 558 F.3d 1368, 1376 (Fed. Cir. 2009) (internal citations omitted). "[T]he applicant must also convey with reasonable clarity to those skilled in the art that, as of the filing date sought, he or she was in possession *of the invention*. The invention is, for purposes of the 'written description' inquiry, *whatever is now claimed*." *Vas-Cath Inc. v. Mahurkar*, 935 F.2d 1555, 1563-64 (Fed. Cir. 1991) (emphasis in original). "And while the description requirement does not demand any particular form of disclosure, or that the specification recite the claimed invention *in haec verba*, a description that merely renders the invention obvious does not satisfy the requirement." *Ariad Pharmaceuticals, Inc. v. Eli Lilly and Co.*, 598 F.3d 1336, 1352 (Fed. Cir. 2011) (citations omitted). "Compliance with the written description requirement is a question of fact but is amenable to summary judgment in cases where no reasonable fact finder could return a verdict for the non-moving party." *PowerOasis, Inc. v. T-Mobile USA, Inc.*, 522 F.3d 1299, 1306-1307 (Fed. Cir. 2008).

## LEVEL OF ORDINARY SKILL IN THE ART

It is well established that patents are interpreted from the perspective of one of ordinary skill in the art. *See Phillips v. AWH Corp.,* 415 F.3d 1303, 1313 (Fed. Cir. 2005) (en banc) ("[T]he ordinary and customary meaning of a claim term is the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention, i.e., as of the effective filing date of the patent application."). The Federal Circuit has advised that the "[f]actors that may be considered in determining the level of skill in the art include: (1) the educational level of the inventors; (2) the type of problems encountered in the art; (3) prior art solutions to those problems; (4) the rapidity with which innovations are made; (5) sophistication of the technology; and (6) education level of active workers in the field." *Env'tl Designs, Ltd. v.*

5

*Union Oil Co. of California*, 713 F.2d 693, 696 (Fed. Cir. 1983). "These factors are not exhaustive but are merely a guide to determining the level of ordinary skill in the art." *Daiichi Sankyo Co. Ltd. v. Apotex, Inc.*, 501 F.3d 1254, 1256 (Fed. Cir. 2007).

Defendants submitted the Declaration of Dr. Dewayne Perry with their petition for *Inter Partes* Review of the '678 Patent ("the IPR") (Dkt. #105, Ex. 10). In his declaration, Dr. Perry opined "that a person of ordinary skill in the art would have had a Bachelor-level degree in computer science or 3-5 years of experience in software development." (Dkt. #105, Ex. 10, at p. 13). For the purposes of this motion, the Court agrees that this would be the level of ordinary skill in the art at the time of the invention.

## THE PARTIES' POSITIONS

"The written description requirement prevents applicants from using the amendment process to update their disclosures (claims or specifications) during their pendency before the patent office. Otherwise applicants could add new matter to their disclosures and date them back to their original filing date, thus defeating an accurate accounting of the priority of invention." *Chiron Corp. v. Genentech, Inc.*, 363 F.3d 1247, 1255 (Fed. Cir. 2004). Defendants contend that the original patent application filed on January 3, 2006, which issued as the '929 Patent, was not directed to the version control system claimed in the '678 Patent (Dkt. #89 at p. 11). According to Defendants, the focus was on a system that tested business intelligence artifacts and detected errors in response to those tests (Dkt. #89 at pp. 11-12). Defendants contend that the claims of '929 Patent confirm that the intent was to claim a system that performed tests, detected errors, and at most recorded versions at predetermined intervals (Dkt. #89 at pp. 11-12).

Defendants argue that the language "detecting a request … to modify" first appeared in the draft set of claims filed with the continuation application on December 30, 2010 (Dkt. #89 at

p. 13). Defendants note that the language was incorporated into the "Abstract" accompanying the continuation application (Dkt. #89 at p. 13). Defendants argue that rather than monitor an artifact and detect modifications to the artifact after those changes have been made, claim 1 is directed to detecting a request to modify an artifact before the artifact is changed (Dkt. #89 at pp. 13-14). Defendants further contend that the system recited in claim 1 finds no support in the specification of either the original application or the continuation application (Dkt. #89 at p. 14).

Specifically, Defendants argue that "detect" only appears in the original specification with reference to "detecting errors" not detecting requests (Dkt. #89 at p. 14) (citing '929 Patent at Abstract, Figure 1, and Claim 1). According to Defendants, detecting errors has nothing to do with detecting a request to modify an object (Dkt. #89 at p. 14). Defendants further argue that there is no discussion of a request to modify an artifact (Dkt. #89 at p. 14). Defendants also argue that the terms "modify" and "modification" do not appear in the original disclosure of the '929 Patent (Dkt. #89 at p. 14). Thus, Defendants contend that the inventors of the '678 Patent did not invent a system that "detect[ed] a request … to modify" a business intelligence artifact under the ordinary meaning of those words (Dkt. #89 at p. 14). Defendants further argue that they instead invented systems that either continuously monitored an artifact or saved versions of an artifact at predetermined intervals (Dkt. #89 at p. 14).

Plaintiff responds that Defendants filed a Petition for *Inter Partes* Review of the '678 Patent with the PTAB arguing that the '678 Patent was invalid under 35 U.S.C. §§ 102, 103 (Dkt. #99 at p. 13). Plaintiff argues that after reviewing the '678 Patent specification and claims, the PTAB denied Defendants' Petition and held that the specification disclosed both versions (before and after) (Dkt. #99 at p. 13). Plaintiff contends that Defendants argued that "'detecting a request to modify' should be construed broadly to include any form of detecting that a request

7

to modify has been made, including polling the artifacts to detect that changes have been made." (Dkt. #99 at p. 13) (quoting Dkt. #99, Ex. 3 at p. 15). Plaintiff argues that in reviewing the '678 Patent specification and interpreting the claims terms at issue, the PTAB expressly stated that the '678 Patent specification discussed both: (1) detecting a request for modification to a report specification (before) or (2) detecting a modification to a report specification (after, *i.e.*, polling) (Dkt. #99 at p. 13) (citing Dkt. #99, Ex. 4 at p. 10). Plaintiff notes that Defendants now argue the opposite of their previous position at the PTAB (Dkt. #99 at p. 14).

Plaintiff further argues that the actions of the examiner during prosecution of the '678 Patent further demonstrate that adequate written description exists for the term "detecting a request … to modify" (Dkt. #99 at p. 15). Plaintiff contends that the examiner rejected application claims 8-11, 13-15, 22 and 26 as failing to comply with the written description requirement of 35 U.S.C. § 112 ¶ 1, but did not reject pending claims 1 or 16 which contained the claim term "detecting a request … to modify" (Dkt. #99 at p. 15). According to Plaintiff, the examiner's § 112 ¶ 1 rejection of some claims but not the claims containing the terms at issue shows that he was carefully reviewing for written description issues in the application, yet found no issue with the claim term "detecting a request … to modify" (Dkt. #99 at p. 15).

Plaintiff further argues that the specification has adequate written description (Dkt. #99 at p. 15). Plaintiff contends that the specification describes the use of the automated agent to record and maintain current and historical versions of the business intelligence artifacts (Dkt. #99 at p. 16) (citing '678 Patent at 3:41–48). Plaintiff further argues that the specification includes numerous references to language which supports the "detecting a request" language at issue (Dkt. #99 at pp. 16-17) (citing '678 Patent at 4:20–23, 1:6–11, and Figure 2). According to Plaintiff, the specification as a whole demonstrates to a person of ordinary skill in the art that the

8

inventor was in possession of a system which performed both types of version control as of the filing date of the '929 Patent (Dkt. #99 at p. 17). Plaintiff argues that the written description of the patent at issue supports detecting the request both before and after the modification is completed pursuant to such request (Dkt. #99 at p. 17). According to Plaintiff, Defendants have failed to carry their burden of proving by clear and convincing undisputed evidence that the '678 Patent does not satisfy the written requirement of 35 U.S.C. §112 ¶1 from the perspective of one of ordinary skill in the art (Dkt. #99 at p. 18).

Defendants reply that "continuously monitoring" a business intelligence system is by no means the same as monitoring or detecting requests for modifications of business intelligence artifacts (Dkt. #103 at p. 3). Defendants argue that the specification makes clear that the purpose of the invention is to "continuously monitor" the business intelligence software and thereby "verify" and "report on" it, not detect changes before they are made to it (Dkt. #103 at p. 3). Defendants further argue that the specification is explicit that the automated agent "continuously monitors changes to" the business intelligence software ("after") rather than requests to modify it ("before") (Dkt. #103 at p. 3).

Defendants also argue that Plaintiff relies heavily on a section of the PTAB's decision summarizing Plaintiff's argument, not the PTAB's actual opinion (Dkt. #103 at p. 6). Defendants contend that the PTAB's acknowledgement that it was "persuaded" by Plaintiff's argument with respect to the construction of the claim term "automated agent," was not an acceptance of Plaintiff's position wholesale (Dkt. #103 at p. 6). According to Defendants, the PTAB did not render any opinion that the specification adequately supports "detecting a request … to modify" as recited in the claims, nor did it otherwise discuss what Plaintiff contends as the "before" and "after" forms of version control (Dkt. #103 at p. 6). Defendants further argue that

the PTAB denied Defendants' IPR petition for other reasons and concluded that this term "need not be construed explicitly at this time" (Dkt. #103 at p. 7) (quoting Dkt. #99, Ex. 4 at p. 12). Defendants argue that this in no way suggests that the PTAB affirmatively endorsed the notion that the claims comported with the requirement of 35 U.S.C. § 112 ¶ 1 because the PTAB was not asked to, and could not, consider such an argument (Dkt. #103 at p. 7). Finally, Defendants contend that they advanced a different, broader construction of the term in the PTAB proceeding because Defendants were not able to raise the fundamental lack of written description support for the term under 35 U.S.C. § 112 before the PTAB (Dkt. #103 at p. 7).

Defendants further argue that the prosecution history does not support adequate written description (Dkt. #103 at p. 7). Defendants contend that there is no evidence that the examiner ever considered the issue of support for "detecting a request … to modify" (Dkt. #103 at p. 7). Defendants argue that Plaintiff cannot point the Court to any excerpt from the office action upholding written description support for the claim term "detecting a request… to modify" (Dkt. #103 at p. 8). Defendants further argue that the prosecution history cited by Plaintiff undermines its own argument (Dkt. #103 at p. 8). According to Defendants, the patentee advocated Defendants' point that "continuous monitoring" refers to detecting modifications to business intelligent artifacts "after" they have been made rather than "before" a request to modify them (Dkt. #103 at p. 8) (citing Dkt. #103, Ex. 2 at pp. 3-4).

Plaintiff replies that the PTAB was unequivocal that the claims cover "before" and "after" detection pursuant to the specification (Dkt. #105 at pp. 2-3). Plaintiff further argues that Defendants misinterpret the prosecution history because the examiner did reject some claims for lack of written description, but did not reject the claims having the claim term "detecting a response … to modify" (Dkt. #105 at pp. 3-4). Plaintiff also argues that 35 U.S.C. § 112 ¶ 1

10

does not require the specification to contain the same words that appear in the claims or that it mention every claim limitation (Dkt. #105 at p. 4). Plaintiff contends that the written description encompasses everything the specification reasonably conveys to one of ordinary skill in the art (Dkt. #105 at p. 4).

Plaintiff further argues that Defendants' technical expert's declaration attached to its IPR petition repeatedly refers to the claim term "detecting a request … to modify" (Dkt. #105 at p. 5) (citing Dkt. #105, Ex. 2). Plaintiff contends that the expert stated that "one of ordinary skill in the art would understand that there are three techniques for a version control system to determine whether to create a new version." (Dkt. #105 at p. 5) (quoting Dkt. #105, Ex. 2 at ¶ 31). Plaintiff argues that the first technique and the third techniques detect a request to modify (before), and the second technique detects a modification (after) (Dkt. #105 at p. 5). Plaintiff contends that Dr. Perry repeats throughout his forty-nine-page declaration that these detecting techniques are well-known to one of ordinary skill in the art (Dkt. #105 at p. 5) (citing Dkt. #105, Ex. 2 at ¶¶ 41, 75-76, 87, and 93). Plaintiff argues this demonstrates that even if the '678 Patent only disclosed detecting a modification, the specification still conveys to a person of ordinary skill that the inventor also had possession of detecting a request to modify (Dkt. #105 at p. 5).

## ANALYSIS

The issue before the Court is whether the specification of the '929 Patent (the parent patent) provides support for the claims in the '678 Patent. *See In re Chu*, 66 F.3d 292, 297 (Fed. Cir. 1995) ("It is elementary patent law that a patent application is entitled to the benefit of the filing date of an earlier filed application only if the disclosure of the earlier application provides support for the claims of the later application, as required by 35 U.S.C. § 112.").[1] Specifically,

---

[1] It is undisputed that the specification of the '929 Patent and the '678 Patent are identical, except for the Abstract (Dkt. #89 at p. 13). Moreover, neither party contends that the difference in the Abstract is material to the issue

the Court must determine if there is a genuine issue of material fact as to whether the written description actually or inherently discloses providing version control by "detecting a request … to modify" a business intelligence artifact. For the following reasons, the Court finds that Defendants failed to prove by clear and convincing evidence that the specification fails to inherently disclose providing version control by "detecting a request … to modify" a business intelligence artifact.

It is not disputed that the '929 Patent explicitly discloses automatic version control. For example, the specification states "[a] system of developing and monitoring a business intelligence environment that utilizes automatic version control . . . ." '929 Patent at Abstract. Likewise, the specification states "[t]he present invention applies continuous integration and automatic version control to improve the efficiency of developing, deploying, and altering business intelligence artifacts." *Id.* at 2:10–14. Similarly, the specification states "[t]he method utilizes a source control system to record and maintain current and historical versions of the business intelligence artifacts during the development or revision of the business intelligence artifacts." *Id.* at 3:32–35.

In fact, the specification explicitly discloses that in the preferred embodiment the automatic version controls operates on a predetermined time interval. Specifically, the specification states that "[t]he source control system records and saves the artifacts at a predetermined time interval that may be established to run every thirty (30) minutes, every hour, or at any other interval determined by the stake holders of the business intelligence environment." *Id.* at 3:35–40. Thus, contrary to Defendants' suggestion, this is not a case where automatic version control was added to the claims of the '678 Patent. Indeed, claim 1 of the '929

---

before the Court.

12

Patent explicitly recites "automatically recording current and previous versions of the business intelligence artifact at a first interval with a source control system." *Id.* at 4:54–56.

Accordingly, the Court's focus turns to whether Defendants proved by clear and convincing evidence that the specification fails to inherently disclose "detecting a request … to modify." The Court finds that Defendants have not met their burden. Indeed, Defendants' expert, Dr. Dewayne Perry, submitted a declaration with the IPR petition that indicates that a person of ordinary skill would understand that the specification inherently discloses "detecting a request … to modify." Specifically, Dr. Perry stated the following in his declaration:

> Version control is well-known and provides the capability to store different versions of objects, such as report specifications in a Business Intelligence system. Moreover, one of ordinary skill in the art would understand that there are three techniques for a version control system to determine whether to create a new version: 1) by the occurrence of some number of changes (usually a single change), 2) by the passage of a predetermined amount of time, and 3) by direction from a user. The "undo" and "redo" commands found in text and document editors are exemplars of the first technique. The automatic periodic "save" of many text and document editors is an exemplar of the second technique. The "checkout" and "checkin" commands of most version control systems, which provide users with the ability to "check out" an object from a version control system, make changes or edits to the object, and then provides the user with the ability to "check in" the object once changes are completed, are exemplars of the third technique. In most version control systems, upon checking in the object, a new version incorporating the changes is saved (which then becomes the "current version") and the old version is saved as a previous version within the repository, providing a user with the ability to revert to older versions if needed. I note that the specification refers only to a "predetermined time" or a "predetermined time interval" with respect to the version control system. Furthermore, it was well known in the art, as demonstrated in prior art references cited by the Patent Owner during prosecution, to combine version control with business intelligence systems, as demonstrated by Exs. 1007, 1009 and 1010.

(Dkt. #105, Ex. 2 at pp. 16-17). At a minimum, Dr. Perry's declaration indicates that there is a genuine issue of material fact as to whether the '678 Patent adequately demonstrates possession

of the invention. As indicated above, Dr. Perry opined that "version control is well-known and provides the capability to store different versions of objects" (Dkt. #105, Ex. 2 at pp. 16-17). Dr. Perry continued, "Moreover, one of ordinary skill in the art would understand that there are three techniques for a version control system to determine whether to create a new version" (Dkt. #105, Ex. 2 at pp. 16-17). Dr. Perry further stated that the "checkout" and "checkin" commands are exemplars of the third technique (Dkt. #105, Ex. 2 at pp. 16-17). As indicated by Dr. Perry's declaration, "an objective inquiry into the four corners of the specification from the perspective of a person of ordinary skill in the art" finds that the disclosed version control may inherently include "detecting a request … to modify." *Ariad Pharms., Inc. v. Eli Lilly & Co.*, 598 F.3d 1336, 1351 (Fed. Cir. 2010). The Court appreciates that "a disclosure in a parent application that merely renders the later-claimed invention obvious is not sufficient to meet the written description requirement." *Tronzo v. Biomet, Inc.*, 156 F.3d 1154, 1158 (Fed. Cir. 1998). However, at a minimum, Dr. Perry's declaration indicates that there is a genuine issue of material fact as to whether the specification inherently discloses providing version control by "detecting a request … to modify" a business intelligence artifact.

Indeed, although not binding, the panel's decision in the IPR further illustrates this point. Specifically, the panel was persuaded by Plaintiff's argument "that the claims and specification of the '678 Patent require that the 'automated agent' . . . interfaces with, the business intelligence system to provide automated version control to a business intelligence artifact, that it independently detects either a request for modification or a modification to a business intelligence artifact, and that it automatically stores the subsequent version." (Dkt. #99, Ex. 4 at p. 10). Thus, consistent with Dr. Perry's declaration, the IPR panel stated that version control included "either a request for modification or a modification to a business intelligence artifact."

14

Accordingly, the Court finds that there is a genuine issue of material fact as to whether the specification inherently discloses providing version control by "detecting a request … to modify" a business intelligence artifact.

Defendants argue that the language "detecting a request … to modify" is not found in the specification and only first appeared in the draft set of claims filed with the continuation application on December 30, 2010 (Dkt. #89 at p. 13). Defendants further argue that there is no discussion of a request to modify an artifact (Dkt. #89 at p. 14). Defendants also argue that the terms "modify" and "modification" do not appear in the original disclosure of the '929 Patent (Dkt. #89 at p. 14). In short, Defendants essentially argue that the specification does not include the words "detecting a request … to modify." However, it is well established that "[a] claim will not be invalidated on section 112 grounds simply because the embodiments of the specification do not contain examples explicitly covering the full scope of the claim language." *LizardTech, Inc. v. Earth Res. Mapping, Inc.*, 424 F.3d 1336, 1345 (Fed. Cir. 2005). As the Federal Circuit stated in *LizardTech*, "it is unnecessary to spell out every detail of the invention in the specification; only enough must be included to convince a person of skill in the art that the inventor possessed the invention . . . ." *Id.*

As discussed above, the Court finds that there is a genuine issue of material fact as to whether the specification adequately demonstrates possession of the invention. Accordingly, the Court finds that Defendants have failed to prove by clear and convincing evidence that claims 1-3 are invalid. *See Tech. Licensing Corp. v. Videotek, Inc.*, 545 F.3d 1316, 1319 (Fed. Cir. 2008) ("It is a long-standing rule of patent law that, because an issued patent is by statute presumed valid, a challenger has the burden of persuasion to show by clear and convincing evidence that the contrary is true. That ultimate burden never shifts, however much the burden of going

forward may jump from one party to another as the issues in the case are raised and developed.").

## CONCLUSION

It is therefore **ORDERED** that Defendants' Renewed Motion for Partial Summary Judgment of Invalidity Under 35 U.S.C. § 112 ¶ 1 (Dkt. #89) is hereby **DENIED**.

**IT IS SO ORDERED.**
SIGNED this 21st day of August, 2015.

_____
AMOS L. MAZZANT
UNITED STATES DISTRICT JUDGE