**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION**

| | |
|---|---|
| MOTIO, INC., | |
| Plaintiff, | Civil Action No. 4:12-CV-00647-ALM |
| v. | Hon. Amos L. Mazzant |
| BSP SOFTWARE LLC, BRIGHTSTAR PARTNERS, INC. and AVNET, INC., | **JURY DEMANDED** |
| Defendants. | |

---

**PLAINTIFF'S OPPOSITION TO DEFENDANTS' RENEWED MOTIONS FOR
JUDGMENT AS A MATTER OF LAW PURSUANT TO FED.R.CIV.P. 50(B)**

---

# TABLE OF CONTENTS

*Page*

I.    INTRODUCTION ............................................................................................ 1

II.   MOTIO'S STATEMENT OF THE ISSUES ................................................... 1

III.  LEGAL STANDARD ..................................................................................... 2

IV.   MOTIO PRESENTED  SUBSTANTIAL EVIDENCE OF CONTRIBUTORY
      AND INDUCEMENT TO INFRINGE ........................................................... 3

      A.    Substantial Evidence of Direct Infringement by an End User Was
            Presented to the Jury .......................................................................... 3

      B.    Motio Identified Two Customers Who Used The Accused IVC Product ............. 4

      C.    Multiple Avnet Witnesses Describe the Use of IVC By Avnet Customers........... 4

      D.    Avnet User Manuals Describe Saving A Report Specification Using IVC........... 7

      E.    Avnet's Cited Cases Are Distinguishable ............................................ 9

V.    SUBSTANTIAL EVIDENCE WAS PRESENTED AT TRIAL TO
      DEMONSTRATE AVNET'S INFRINGEMENT ......................................... 10

      A.    Motio Presented Substantial Evidence of Copying ........................... 10

      B.    Mr. Weiss' Testimony is Inconsistent With Positions Avnet Took Before
            The Patent Trial and Appeal Board ................................................... 11

VI.   MOTIO PRESENTED SUBSTANTIAL EVIDENCE OF INFRINGEMENT ............. 12

      A.    Avnet's IVC Product Detects a Request to Modify ........................... 13

      B.    Motio Demonstrated That The IVC Product Contains "An Automated
            Agent That Interfaces With The Business Intelligence System." ........ 16

      C.    Motio Demonstrated That The IVC Product Contains an Automated Agent
            "To Provide Automated Version Control" ......................................... 17

VII.  AVNET HAS NOT SHOWN THAT A REASONABLE JUROR COULD NOT
      FIND THAT THERE IS NOT CLEAR AND CONVINCING EVIDENCE THAT
      THE WRITTEN DESCRIPTION REQUIREMENT OF 35 USC § 112 IS NOT
      SATISFIED .................................................................................................... 19

      A.    Legal Standard .................................................................................. 19

      B.    The '678 Specification Does Provide Support for the Claims............. 21

            1.    The Specification Has Adequate Written Description........................... 22

            2.    The Patent Examiner's Actions During  Prosecution Support
                  Adequate Written Description ................................................. 25

            3.    The Patent and Trademark Board of Appeals ("PTAB") Held That
                  The Specification Supports The Claims .................................. 26

# TABLE OF CONTENTS
### *(Continued)*

*Page*

VIII. AVNET HAS FAILED TO SHOW THAT A REASONABLE JUROR COULD NOT HAVE FOUND THAT THERE IS NOT CLEAR AND CONVICING EVIDENCE THAT THE CLAIMS OF THE '678 PATENT ARE INVALID UNDER 35 U.S.C. §102(B).............................................................................. 27

IX. THE '678 PATENT CLAIMS A SPECIFIC TYPE OF VERSION CONTROL AND IS THUS PATENT ELIGIBLE............................................................ 29

    A. The '678 Patent Does Not Claim A Broad Monopoly to Version Control.......... 29

    B. The Claimed Invention Provides a Unique Structure With a Specific Method .................................................................................................. 30

X. MOTIO PRESENTED SUBSTANTIAL EVIDENCE THAT THE '678 PATENT IS VALID IN VIEW OF HUMMINGBIRD AND GENTNER .................................... 31

    A. There Is Not Clear and Convincing Evidence That Claims 1-3 Are Invalid As Being Obvious In View Of Hummingbird ...................................... 31

    B. Motio Presented Substantial Evidence Regarding the Objective Indicia of Non-Obviousness ................................................................................. 33

    C. There Is Not Clear and Convincing Evidence That Claims 1-3 Are Invalid As Being Obvious In View Of Hummingbird With Gentner .............................. 35

XI. MOTIO PRESENTED SUBSTANTIAL EVIDENCE THAT IT WAS ENTITLED TO LOST PROFITS AND A REASONABLE ROYALTY ...................... 35

    A. There was Sufficient Evidence to Support Lost Profits....................................... 35

    B. There was Sufficient Evidence to Support Reasonable Royalty ........................ 37

XII. AVNET IS NOT ENTITLED TO A NEW TRIAL.......................................................... 38

    A. Avnet's Copying of MotioCI is Highly Relevant to the Issues Presented During Trial .................................................................................... 38

    B. Defendants Are Not Entitled to a New Trial on Infringement or Validity .......... 39

XIII. CONCLUSION.......................................................................................................... 40

# TABLE OF AUTHORITIES

*Page(s)*

## Cases

*Acco Brands, Inc. v. ABA Locks Manufacturer Co.*, 501 F.3d 1307 (Fed.Cir. 2007).....................9

*Alco Standard Corp. v. Tenn. Valley Auth.*, 808 F.2d 1490 (Fed. Cir. 1986).................................3

*All Dental Prodx LLC v. Advantage Dental Prods.*, 309 F.3d 774 (Fed. Cir. 2002)..............20, 24

*Anascape, Ltd. v. Nintendo of America, Inc.,*601 F.3d 1333 (Fed. Cir. 2010) .............................28

*Ariad Pharms., Inc. v. Eli Lilly & Co.*, 598 F.3d 1336 (Fed. Cir. 2010) (*en banc*)................20, 24

*Bard Peripheral Vascular, Inc. v. W.L. Gore & Assocs.*, 670 F.3d 1171 (Fed. Cir. 2012) .....................................................................................................................................20

*Capon v. Eshhar*, 418 F.3d 1349 (Fed. Cir. 2005).................................................................20, 24

*Centricut, LLC v. Esab.Grp., Inc.*, 390 F.3d 1361 (Fed.Cir.2004).............................................16

*Colorado v. New Mexico*, 467 U.S. 310 (1984)........................................................................19

*Commonwealth Scientific and Industrial Research Organization v. Buffalo (USA), Inc.*, 542 F.3d 1363 (Fed. Cir. 2008) .......................................................................................31

*Ecolochem, Inc. v. Southern California Edison Co.*, 227 F.3d 1361 (Fed. Cir. 2000) ......................................................................................................................................33

*Hitachi Consumer Elecs. Co. v. Top Victory Elecs. (Taiwan) Co.*, No. 2:10-CV-260-JRG, 2013 WL 5273326 (E.D. Tex. Sept. 18, 2013)....................................................2, 38

*Hybritech Inc. v. Monoclonal Antibodies, Inc.*, 802 F.2d 1367 (Fed. Cir. 1986) .........................20

*Kinetic Concepts, Inc. v. Blue Sky Medical Group, Inc.*, 554 F.3d 1010 (Fed. Cir. 2009) ......................................................................................................................................31

*KSR Int'l Co. v. Teleflex Inc.*, 127 S.Ct.1727 (2007)...............................................................30, 31

*Lucent Tech., Inc. v. Gateway, Inc., et al.*, 580 F.3d 1301 (Fed. Cir. 2009)...................................3

*Medtronic, Inc. v. Cardiac Pacemakers, Inc.*, 721 F.2d 1563 (Fed.Cir.1983) .......................18, 31

*Mirror Worlds, LLC v. Apple Inc.*, 692 F.3d 1351 (Fed.Cir. 2012) ...............................................9

*Moleculon Research Corp. v. CBS, Inc.*, 793 F.2d 1261 (Fed. Cir. 1986) .....................................4

*National Presto Indus. v. West Bend Co.*, 76 F.3d 1185 (Fed.Cir. 1996)......................................11

*Ortho-McNeil Pharm., Inc. v. Mylan Labs., Inc.*, 520 F.3d 1358 (Fed. Cir. 2008) .....................33

*Pandrol USA, LP v. Airboss Ry. Products, Inc.*, 320 F.3d 1354 (Fed.Cir 2003)...................18, 31

*PowerOasis, Inc. v. T-Mobile USA,* 522 F.3d 1299 (Fed. Cir. 2008)....................................27, 28

*Technology Licensing Corp. v. Videotek, Inc.,* 545 F.3d 1316 (Fed. Cir. 2008) ....................27, 28

*Toshiba Corp. v. Imation Corp.*, 681 F.3d 1358 (Fed. Cir. 2012).................................................3

*Transco Prods. Inc. v. Performance Contracting, Inc.* 38 F.3d 551 (Fed. Cir. 1994) ............................................................................................................................27

*Vas-Cath, Inc. v. Mahurkar*, 935 F.2d 1555 (Fed. Cir. 1991) ......................................................21

*Vita-Mix Corp. v. Basic Holding, Inc.*, 581 F.3d 1317 (Fed. Cir. 2009) .......................................3

**Statutes**

35 U.S.C. 112 ¶1 ...............................................................................................................................19

35 U.S.C. §101......................................................................................................................................2

35 U.S.C. §102....................................................................................................................................27

35 U.S.C. §§102, 103....................................................................................................................12, 25

35 U.S.C. §102(b) ...........................................................................................................................1, 26

35 U.S.C. §103..............................................................................................................................2, 30

35 U.S.C. §112..............................................................................................................................1, 19

35 U.S.C. § 112 ¶ 1 ....................................................................................................................25, 27

35 U.S.C. §282....................................................................................................................................19

**Other Authorities**

U.S. Patent 7,885,929 ...................................................................................................................27, 28

U.S. Patent No. 8,285,678.................................................................................................... *passim*

iv

## I.    INTRODUCTION

Motio invented a new and novel way of providing automated version control to a business intelligence system using an automated agent.  While initially selling IVC without an automated agent, within a year of its launch, Avnet downloaded a copy of Motio's product and proceeded to copy Motio's method of providing version control to a business intelligence system using an automated agent.

As described below, Motio presented substantial evidence that Avnet indirectly infringed the '678 Patent by selling its IVC product to customers of Cognos.  Motio presented substantial evidence that the '678 Patent was valid in light of the dozens of obviousness combinations set forth by Avnet.  Motio also demonstrated it was entitled to lost profits.  Throughout its Motion, Avnet selectively cites to testimony which purports to support its position while completely ignoring other evidence.  Avnet has not met its high burden and its Motion should be denied.

## II.    MOTIO'S STATEMENT OF THE ISSUES

1.    Whether there was a legally sufficient evidentiary basis for the jury to find that Avnet contributorily infringed claims 1-3 of the '678 Patent.

2.    Whether was a legally sufficient evidentiary basis for a reasonable jury to find that Avnet induced infringement of claims 1-3 of the '678 Patent.

3.    Whether there was a legally sufficient evidentiary basis for a reasonable jury to find that there was not clear and convincing evidence that claims 1-3 of the '678 Patent are invalid due to lack of written description under 35 U.S.C. §112.

4.      Whether there was a legally sufficient evidentiary basis for a reasonable jury to find that there was not clear and convincing evidence that claims 1-3 of the '678 Patent are invalid for prior public use under 35 U.S.C. §102(b).

5.      Whether there was a legally sufficient evidentiary basis for a reasonable jury to find that there was not clear and convincing evidence that claims 1-3 of the '678 Patent are invalid for being obvious under 35 U.S.C. §103.

6.      Whether, as a matter of law, there is clear and convincing evidence that claims 1-3 are invalid for claiming an ineligible abstract idea under 35 U.S.C. §101.

7.      Whether there was a legally sufficient evidentiary basis for a reasonable jury to find $1,224,955.87 in damages.

8.      Whether the Court should grant a new trial on liability.

## III.   <u>LEGAL STANDARD</u>

"[A] jury verdict must be upheld, and judgment as a matter of law may not be granted, unless there is no legally sufficient evidentiary basis for a reasonable jury to find as the jury did." *Hitachi Consumer Elecs. Co. v. Top Victory Elecs. (Taiwan) Co.*, No. 2:10-CV-260-JRG, 2013 WL 5273326, at *1 (E.D. Tex. Sept. 18, 2013). This Court is instructed to review the entirety of the record, and draw all reasonable inferences in favor of Motio. *Id*. at *2. This Court may not, however, "make credibility determinations or weigh the evidence, as those are solely functions of the jury." *Id*. Defendants are entitled to prevail only where the evidence "points so strongly and so overwhelmingly in favor of [them] that no reasonable juror could return a contract verdict." *Id*. Defendants fail to satisfy this heavy burden.

## IV.    MOTIO PRESENTED  SUBSTANTIAL EVIDENCE OF CONTRIBUTORY AND INDUCEMENT TO INFRINGE

Motio presented substantial evidence of contributory and inducement to infringement by the use of IVC.  In regards to direct infringement and as discussed below, this includes the identification of customers of Avnet who actually used the infringing product IVC. It also included a detailed description by the architect of IVC, Andrew Weiss, in which he demonstrates how users actually use IVC to save report specifications in report studio.  Moreover, both of Avnet's experts also testified about the use of IVC by customers.  Indeed, Dr. Grimes entire presentation was "from the standpoint of a user" who uses IVC.

Motio also presented substantial evidence of Avnet's intent to cause infringement.  Motio demonstrated that Avnet clandestinely sought and received detailed information on how the MotioCI product operated, and soon thereafter admittedly changed the underlying operation of the IVC product to implement the same method used in the MotioCI product.

### A.    Substantial Evidence of Direct Infringement by an End User Was Presented to the Jury

To infringe a method claim, an entity must have practiced all steps of the claimed method.  *Lucent Tech., Inc. v. Gateway, Inc., et al.*, 580 F.3d 1301, 1317 (Fed. Cir. 2009). However, "a finding of infringement can rest on as little as one instance of the claimed method being performed…" *Id.*

Direct infringement can be proven by either direct or circumstantial evidence.  *Toshiba Corp. v. Imation Corp.*, 681 F.3d 1358, 1364 (Fed. Cir. 2012), *citing Vita-Mix Corp. v. Basic Holding, Inc.*, 581 F.3d 1317, 1327 (Fed. Cir. 2009).  Circumstantial evidence of infringement should be given the same weight as direct evidence of infringement.  *Alco Standard Corp. v.*

*Tenn. Valley Auth.*, 808 F.2d 1490, 1503 (Fed. Cir. 1986) ("Although the evidence of infringement is circumstantial, that does not make it any less credible or persuasive."); *Moleculon Research Corp. v. CBS, Inc.*, 793 F.2d 1261, 1272 (Fed. Cir. 1986) ("It is hornbook law that direct evidence of a fact is not necessary.  Circumstantial evidence is not only sufficient, but may also be more certain, satisfying and persuasive than direct evidence.") (internal quotations omitted).   As discussed below, Motio presented both direct *and* circumstantial evidence of infringement of the '678 Patent.

**B.     Motio Identified Two Customers Who Used The Accused IVC Product**

Motio specifically identified two customers who used the IVC product.   During Mr. Moore's direct examination, he identified Bank of America and Boeing who used IVC to version report specifications. (Ex. A, Trial Tr. 1/20/2016 AM at 31:24-32:4).   These are two instances in which Mr. Moore had personal knowledge regarding Bank of America and Boeing using the IVC product.  While Mr. Weiss may think differently, a reasonable jury could weigh the evidence and conclude that Mr. Moore's testimony is the correct one.

**C.     Multiple Avnet Witnesses Describe the Use of IVC By Avnet Customers**

Andrew Weiss, Gary Evans, Dr. Jack Grimes and Russell Parr – all Avnet witnesses described in detail how Avnet's customers use IVC. First, in regards to Avnet's technical expert witness, Dr. Grimes explained in detail *how* a user of Avnet's IVC product uses and saves a report specification in Cognos with IVC installed – the accused method of Claim 1.   While explaining how the IVC product was installed and used with Cognos, Dr. Grimes specifically stated that his analysis described "the operation of the system really from the – **from the standpoint of the user**, the person doing the – doing the editing and how the system operated in

the  -- in the background, once the save command was clicked." (Ex. A, Trial Tr. 1/26/2016 AM at 34:10-15)  It is more than reasonable to conclude that Dr. Grimes would not have stated this unless he had knowledge relating to how users of IVC actually used the product.

Dr. Grimes' entire analysis repeatedly referred to how the user uses IVC with Cognos – the infringing method.  For example, during Dr. Grimes' cross-examination, he refers dozens of times to what a "user" is doing during the process of saving  in Cognos with the accused product IVC installed.  (*See generally*, Ex. A, Trial Tr. 1/26/2016 AM at 68-73, PM at 41-49).

Second, Mr. Weiss also testified how users of IVC practice the method of Claim 1 of the '678 Patent.  Mr. Weiss presented a video that he created in which he describes in detail how a user saves report specifications to Cognos with IVC installed. (Ex. A, Trial Tr. 1/22/2016 AM at 39:2-4) ("Now, the user will save the report, having made no modifications, and we'll just wait a couple of seconds here for demonstration"); *Id.* at 39:8-11 ("So the user is creating versions in the version control repository every time they hit the save button and then can choose the View Revision History button, just a few buttons over to the right.)  Mr. Weiss is explaining how its customers use the IVC product to save and version report specifications to Cognos with IVC installed.

Similarly, using a block diagram, Mr. Weiss explained in detail the operation of IVC as it is installed on Cognos.  During this testimony, he explained how IVC operates from the vantage point of a user of IVC.  (Ex. A, Trial Tr. 1/22/2016 AM at 33:25 – 34:4) ("Q. Okay. And if the **user** wants to work on a report specification, what do they do? A. So the **user** will explicitly choose the open button inside this studio. And then what happens is the web browser will make a request to the Cognos gateway.") (emphasis added) Similar to Dr. Grimes, Mr. Weiss provided a

detailed description of the operation of IVC and consequently the infringing method, from the vantage of the end user.  As the chief software architect of IVC, Mr. Weiss has knowledge regarding how users use the IVC product.  He used this knowledge to demonstrate and explain to the jury how such users use the IVC product.  Such testimony from Mr. Weiss further shows how customers of Avnet's IVC use the product and practice the method of Claim 1 of the '678 Patent.

Third, Gary Evans described how Avnet's "go-to-market strategy" requires that any purchaser of Avnet's ICS product suite must purchase version control as part of IVC.  (Ex. A, Trial Tr. 1/21/2016 PM at 110:9-16) ("Q. Your go-to-market strategy, sir, was you couldn't get any other module unless you also got Version Control, correct?  A. That's how we market it on the website. Q. And this marketing on the website doesn't say that you are flexible or you can change individual ones to fit your needs, does it? A. It does not, no.")  During cross-examination, Mr. Evans described Plaintiff's Trial Exhibit No. 32, which is a marketing piece from Avnet's website. (PTX32)   He explained that PTX32 is Avnet's "go-to-market strategy" and describes the various ICS packages Avnet sells. (Ex. A, Trial Tr. 1/21/2016 PM at 104:25-105:3)   Mr. Evans agreed that each of the base packages – Standalone, Distributed, and Lifecycle – in which IVC is the only product included are required to be purchased before Avnet would sell the "Enhanced Package" which contained the remaining five modules in the ICS suite.  Mr. Evans testified that these marketing materials state that even if customers wanted the five other modules of the ICS suite, they would first have to purchase IVC – the accused product which infringes Claim 1 of the '678 Patent by providing automated version control.  (*Id.*)

Motio presented evidence that Avnet requires the purchase of IVC for every sale of its ICS product suite.  As described above, Mr. Weiss and Dr. Grimes both testified how an end user of IVC actually uses the product.  It is reasonable for a jury to therefore conclude that at least one of those purchasers of IVC practices the very method presented to the jury by Mr. Weiss and Dr. Grimes.

Fourth, Mr. Parr testified that his analysis relied upon the actual use of IVC by Avnet customers.  Mr. Parr specifically referenced DTX 1330 which is a listing of those Avnet customers who purchased IVC. Mr. Parr explained that for purposes of his analysis, he assumed that the IVC customers identified in DTX 1330 used the product.  (Ex. A, Trial Tr. 1/27/2016 AM at 13:4-5) ("Q. And you assumed that IVC's customers used the product? A. Yes.").  Mr. Parr further stated that he assumed that if a customer buys IVC they are actually using the product. (*Id.* at 13:6-8).  Mr. Parr stated that this assumption was reasonable based upon the Avnet documents that he reviewed. (*Id.* at 13:9-12)

Avnet's own witnesses described in detail how its users practice the method of Claim 1 by using the IVC product.  As such Motio has presented substantial evidence of use of the IVC product by an end user.  A reasonable jury could find, by a preponderance of the evidence, that at least one end user of IVC practices the claimed invention by use of the IVC product.

### D.    Avnet User Manuals Describe Saving A Report Specification Using IVC

In his infringement analysis, Peter Martin described how he relied upon ICS/IVC installation and user manuals.  Specifically, in describing how the use of IVC infringes Claim 1 of the '678 Patent, Mr. Martin specifically referred to installation and user manuals for ICS.  In regards to the installation manuals, Mr. Martin testified that they described how Avnet instructed

its customers to install IVC within Cognos. (Ex. A, Trial Tr. 1/20/2016 PM at 86:17-87:3) ("The installation guide described steps that a technician would take to approach an installation that was already outfitted to run Cognos Business Intelligence system and add certain files and make certain changes to existing files related to the Cognos installation so that when the Cognos Business Intelligence system was restarted, it would be restarted with the IVC product coupled in and connected to and operation...")

In addition, Mr. Martin described how the IVC user guides describe *how* a customer of Avnet was expected to operate the product.  Mr. Martin testified that he reviewed IVC user guides and that he believed they were clearly written and that he could determine what was involved in installing and operating IVC.  (Ex. A, Trial Tr. 1/20/2016 PM at 86:14-16) ("And as far as I'm concerned, they were clearly written.  I could see what was involved in installing and operating the software.")

Moreover, during Mr. Martin's infringement analysis he specifically quoted from the ICS user guide which explained that "[w]ithin the ICS environment, the save button now represents a transparent save.  Clicking the save button will save the report definition to the content store in place of the existing report definition.  As well, ICS will save a copy of the report definition to the ICS repository." (*Id.* at 118:19-119:5).  Mr. Martin went on to explain that the ICS user guide is "a narrative product that is – narrative manual that is distributed with the product to the customers of Avnet/BSP who are customers of ICS." (*Id.* at 119:8-10).  The installation and user guides described to the jury by Mr. Martin demonstrate how Avnet instructs its customers on the use of IVC and further shows that the end users of IVC practice the method in Claim 1 of the '678 Patent.

**PLAINTIFF'S OPPOSITION TO**                                                                      **Page 8**
**RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW**

Finally, Mr. Martin directly testified as to his belief that the customers of Avnet practice the method in Claim 1 of the '678 Patent. (Ex. A, Trial Tr. 1/27/2016 PM at 29:19-30:12) ("I believe that the customers of BSP who install the software in combination with Cognos Business Intelligence system practice the patent. … If [the purchasers of IVC] install and operate the software, then they practice all limitations.")

### E.     Avnet's Cited Cases Are Distinguishable

The cases Avnet relies upon are distinguishable from the current case.  In *Acco Brands, Inc. v. ABA Locks Manufacturer Co.*, 501 F.3d 1307 (Fed.Cir. 2007), the plaintiff only relied upon its expert testifying that the "natural and intuitive way to employ" the accused product was in an infringing mode.  *Id.* at 1312.  In addition, the accused product was sold with instructions which only described a non-infringing use.  *Id.*

In *Mirror Worlds, LLC v. Apple Inc.*, 692 F.3d 1351 (Fed.Cir. 2012), the plaintiff only relied upon manuals which discussed the infringing method.  The plaintiff did not provide any other evidence of infringement by the end user.

In the instant case, Motio presented substantial evidence of end user infringement.  As detailed above, this included: (1) Motio identifying two customers who used IVC, (2) Avnet's technical expert explaining how IVC is used "from the standpoint of the user," (3) Mr. Weiss, the principal software developer of IVC, providing a demonstration of how a user actually uses IVC to save a report specification, (4) Avnet's Gary Evans stating that Avnet requires that any purchaser of Avnet's ICS product suite must purchase version control as part of IVC, (5) Avnet's Mr. Parr testifying that he believed IVC was used by the end user to save report specifications based upon his review of the materials, and (6) Mr. Martin testified that the IVC user guides

describe *how* a customer of Avnet was expected to operate the product.    This evidence is multitudes more than the minimal evidence discussed in the cited cases.

## V.    SUBSTANTIAL    EVIDENCE    WAS    PRESENTED    AT    TRIAL    TO DEMONSTRATE AVNET'S INFRINGEMENT

Motio presented substantial evidence of Avnet's intent to cause infringement of the '678 Patent.  Significantly, this included Avnet's copying of the MotioCI product covered by the '678 Patent.  During trial, Motio presented significant evidence of Avnet's copying.

### A.    Motio Presented Substantial Evidence of Copying

Mr. Weiss and Mr. Rachmiel – who are close personal friends – testified that they clandestinely sought and obtained a copy of MotioCI so they could figure out how the product worked.  Mr. Rachmiel testified that he signed up for a MotioCI webinar using a fake email address. (Ex. A, Trial Tr. 1/20/2016 AM at 62:16-63:4)  Also using the same fake email address, he then submitted a request via Motio's webpage to download MotioCI. (PTX48)  After receiving the download link Mr. Rachmiel forwarded the download link to Mr. Weiss. (PTX49)  Mr. Weiss testified that he "poked around at the files," the MotioCI files. (PTX50)  A couple of hours later after midnight, Mr. Weiss sent Mr. Rachmiel an email explaining in great detail how MotioCI operates including MotioCI's use of a filter to version report specification in Cognos. (*Id.*)

Six months later and in another email string to Mr. Rachmiel, Mr. Weiss explained how he implemented a filter and how the versioning process in IVC is now the same as MotioCI. (PTX51)  Mr. Weiss testified that when he accessed MotioCI in April of 2009, IVC versioned in a different way but then by October of 2009, it implemented a filter – the same way MotioCI had been performing versioning in Cognos since 2006. (Ex. A, Trial Tr. 1/22/2016 AM at 78:2-

81:15)  Indeed, Mr. Weiss was so excited about the implementation of a filter in IVC that he wrote in all caps: "BOOYAH" which he testified he uses "whenever we're excited and that we feel like we've accomplished something or made a step forward."  (Ex. A, Trial Tr. 1/22/2016 AM at 79:4-6)  Mr. Weiss further explained that using a filter was a better way of performing version control. (*Id.* at 79:17-18) ("Q. A better way of performing version control, correct? A. You can classify it that way, sure.")

Avnet's reliance on *National Presto Indus. v. West Bend Co.*, 76 F.3d 1185 (Fed.Cir. 1996), is misplaced.  In *National Presto*, the Federal Circuit held that the sale of a product before the issuance of the patent could not be a basis for inducement to infringe once the patent issues. *Id.* at 1196.  The case did not stand for the proposition that activity before the issuance of the patent was irrelevant to demonstrate intent.  It only held that a product sold before the issuance of a patent cannot thereafter be held to infringe under a theory of inducement. *Id.* Contrary to Avnet's argument, the Federal Circuit's discussion of inducement to infringe had absolutely nothing to do with copying.

### B.   Mr. Weiss' Testimony is Inconsistent With Positions Avnet Took Before The Patent Trial and Appeal Board

Avnet argues that Mr. Weiss's testimony that he subjectively believed Avnet did not infringe demonstrates Avnet did not have an intent to infringe – this argument is without merit. Mr. Weiss testified that he believed that the patent was only related to "polling intervals." (Ex. A, Trial Tr. 1/22/2016 PM at 4:18-5:5)  As discussed below, the veracity of Mr. Weiss' testimony is questionable.

In May 2013, only 7 months after Motio filed this litigation, Avnet filed a Petition for *Inter Partes* Review of the '678 Patent with the PTAB arguing that the '678 Patent was invalid

under 35 U.S.C. §§102, 103 based upon the same prior art references asserted in this litigation.[1] After reviewing the '678 specification and claims, the PTAB denied Defendants' Petition and held that the specification disclosed "detecting a request ... to modify."   Specifically, in their Petition, Avnet argued that "detecting a request to modify" "should be construed broadly to include ***any form* of detecting that a request to modify has been made**, including polling the artifacts to detect that changes have been made." (PTX3A, p.12, emphasis added)

Mr. Weiss's testimony that Avnet believed the '678 Patent is limited to polling is completely opposite of the argument Avnet made to the PTAB in which they stated that Claim 1 should be construed broadly to include "***any form* of detecting that a request to modify has been made...**"[2] (*Id.*)   Such admission further demonstrates that Avnet believed the '678 Patent was **not** limited to polling, knew that IVC infringed the '678 Patent and intended that its customers infringe by selling IVC.

## VI.   MOTIO PRESENTED SUBSTANTIAL EVIDENCE OF INFRINGEMENT

Motio presented substantial evidence of infringement of the '678 Patent by the use of Avnet's IVC product.   Avnet does not disagree; they merely do not like the evidence that Motio presented.   For the reasons discussed below, Avnet's Motion regarding infringement should be denied.

---

[1] If Avnet thought they did not infringe, there would be no reason for it to file a Petition at the PTAB – a process which takes a tremendous amount of time (and fees) to prepare.

[2] Mr. Weiss' testimony is also inconsistent with the PTAB's November 29, 2013 decision in interpreting the claims that the '678 specification "detects either a request for modification or a modification to a business intelligence artifact."  (PTX3C, p.9)

A.    <u>Avnet's IVC Product Detects a Request to Modify</u>

"[D]etecting a request to the business intelligence system to modify…" is the process by which the IVC product detects that a report specification previously stored in the Content Store *will be* modified or replaced.[3]   As discussed below, Motio's technical expert, Mr. Martin, explained in detail that this claim language is discussing that the modification to the report specification has not yet occurred and will take place in the future.   That is, the modification to the report specification does not take place until it is actually modified in the Content Store. Since the filter in IVC intercepts the request to modify the report specification before it reaches the Content Store it meets this claim limitation.   As explained below, Mr. Martin, presented substantial evidence, including a detailed explanation of the IVC computer source code, that the IVC product meets this claim limitation.[4]   As such, JMOL is inappropriate because a reasonable jury could conclude that IVC infringes.

Mr. Martin testified that the use of IVC practices this claim limitation.   More specifically, Mr. Martin explained to the jury that the source code of IVC shows that the IVC filter detects a request to save the report specification.   (Ex. A, Trial Tr. 1/21/2016 AM at 18:18-19:2) ("[t]he message is routed to the IVC filter and the filter detects that request, that message – at that point, it's a message – and the filter peeks into the message to determine that it constitutes a request to

---

[3] Avnet's truncation of this limitation to "detecting a request … to modify" is misleading.  The full claim limitation "detecting a request to the business intelligence system to modify" clearly demonstrates that the request is to the business intelligence system <u>not</u> a request from a boss to a typist as Dr. Grimes asserted. (Ex. A, Trial Tr. 1/26/2016 PM at 52:14-53:4)

[4] Mr. Martin stated that his analysis of the IVC source code was "critical" in forming his opinion of infringement.  Incredibly, Dr. Grimes did not review or analyze the IVC source code at all.  As such, it would be reasonable for a jury to discount Dr. Grimes' testimony in its entirety. (Ex. A, Trial Tr. 1/26/2016 AM at 72:25-73:8)

save.")  Importantly, Mr. Martin described how a report specification has only been modified once it has been actually stored in the Content Store. (Ex. A, Trial Tr. 1/27/2016 AM at 78:11-13) ("But the business intelligence system isn't going to call it a business intelligence artifact until it is officially, if you will, stored in the content store.")

Avnet's latest argument – that some form of comparison is required – is simply without merit and not supported by any evidence.  First, Claim 1 of the '678 Patent has absolutely nothing to do with comparing report specifications.  Avnet's attempts to read in a claim limitation requiring some type of comparison should be rejected by the Court.  Second, Avnet's Motion incorrectly interchanges "to modify" (future) – the language in the claims at issue – with "modification" (past tense).  All of the testimony cited by Avnet is directed solely to discussing a modification that has already occurred and not "to modify" (future) as provided for in Claim 1 of the '678 Patent.[5]

As described above, when the IVC filter analyzes the incoming message, the report specification has not yet been modified in the Content Store.  Thus, the IVC filter is "detecting a request *to* the business intelligence system *to* modify."  There is no need to determine whether a change has occurred because IVC is detecting the request to modify before the actual modification takes place in the Content Store.  Mr. Martin described this in detail. (*Id.*) As such, it was reasonable for the jury to determine that the IVC product meets this claim limitation.

_____

[5] Claims 4-10, which were not at issue during trial, are directed to detecting "modifications" (past tense).  (PTX1, Col. 5-6)

Avnet's theory that Mr. Martin's use of the word "equivalent" somehow invokes the doctrine of equivalents is without merit.  In the testimony Avnet cites in its Motion (pp.17-18) Mr. Martin is explaining that detecting a request to save is detecting a request to modify.  He is <u>not</u> stating, as is the case with the doctrine of equivalents, that this limitation is completely missing from IVC but that a save request is equivalent to detecting a request. As described above, Mr. Martin explained that a save request is a request to modify.

Consistent with Mr. Martin's testimony is the way in which Cognos identifies how report specifications are stored in Cognos.  PTX 171, which Mr. Weiss testified is a screen shot of Cognos Connection, shows how each time a report specification is saved to Cognos, the modified time and date are updated to reflect such save.  (Ex. A, Trial Tr. 1/22/2016 AM at 64:17-19) ("Q. And that modified time and date corresponds to when that report was stored in the Cognos content store, correct? A. Yes, that's correct.")  Mr. Weiss further confirmed that in Cognos a save results in a modification to the report specification in the Cognos Content Store. (Ex. A, Trial Tr. 1/22/2016 AM at 67:1-9) ("Q. So according to Cognos, when a report author saves the report specification, Cognos identifies it as modified even if the author – report author didn't make any changes, correct? A. Well, the label is modified, but it's the recordkeeping of when the data was replaced in the database. Q. But the listing here says "Modified," correct? A. It's not saying they're different, **but it just says that the date – data in the database was modified at that time**.") (emphasis added).  It was reasonable for a jury to conclude that Mr. Weiss' testimony confirmed that a save in Cognos is a request to the business intelligence system to modify a report specification in the Content Store.

Avnet's argument that Motio was somehow required to provide expert testimony is without merit.  Motio did provide expert testimony regarding how this claim limitation is met by the IVC product.  As explained above, Mr. Martin provided a detailed explanation, using the IVC source code and other materials as to how the IVC product "detect[s] a request to the business intelligence system to modify."  Testimony from Mr. Weiss regarding how Cognos treats a save (PTX 171) is consistent with Mr. Martin's testimony.

Regardless, Motio is not required to present expert testimony as argued by Avnet.  The cases Avnet cites all refer to technically complex claim limitations.  Indeed, in *Centricut, LLC v. Esab.Grp., Inc.*, 390 F.3d 1361 (Fed.Cir. 2004) cited by Avnet, the Federal Circuit specifically stated that "in many patent cases expert testimony will not be necessary because the technology will be easily understandable without the need for expert explanatory testimony." *Id.* at 1369. (internal quotations omitted).  However, this Court, in its *Markman* opinion, stated that this claim limitation should be given its plain and ordinary meaning because it "is unambiguous, is easily understandable by a jury, and requires no construction." [dkt# 145, p.31]  Expert testimony is therefore not required.[6]

**B.** **Motio Demonstrated That The IVC Product Contains "An Automated Agent That Interfaces With The Business Intelligence System."**

Motio presented substantial evidence that the IVC product practices the claim limitation "an automated agent that interfaces with the business intelligence system."  Mr. Martin testified that the use of IVC practices this claim limitation and explained in detail to the jury that the source code of IVC shows how the CMFilter interfaces with the business intelligence system.

---

[6] Admittedly, Mr. Weiss is knowledgeable about Cognos having worked with it for many years. (Ex. A, Trial Tr. 1/22/2016 AM at 61:13-25)

Mr. Martin explained to the jury that the function "doFilter" is within the Java class CMFilter.  (Ex. A, Trial Tr. 1/20/2016 PM at 114:9-22) He went on to explain that "interface" is a keyword in the Java programming language and that "what is meant here is that CMFilter is one of those classes that conforms to a certain interface known to software that is provided by the Cognos BI system, but CMFilter and the code contained within it is Avnet BSP's filter code." (*Id.* at 115:3-8,11-15)  Mr. Martin further explained to the jury how the CMFilter communicates with Cognos including where in the IVC source code the CMFilter interfaces with Cognos.  (Ex. A, Trial Tr. 1/27/2016 AM at 70:4-10) ("Q. And in your analysis, your infringement analysis of the IVC system, did you review the IVC source code? A. Yes, I reviewed the IVC source code and identified in the source code structurally in the software how the interfacing happens and where the flow of control enters into the software module and how it goes about processing.")

Avnet's argument that since the filter is part of the business intelligence system, it cannot "interface with" the business intelligence system is without merit and completely ignores the analysis of the IVC source code presented by Mr. Martin.  Even if it did have merit, the jury rejected Avnet's non-infringement contention and adopted Mr. Martin's detailed analysis as described above.  Avnet's technical expert, Dr. Jack Grimes admittedly did not review the source code to IVC and therefore could not have possibly known how the IVC CMFilter interfaces with Cognos.  (Ex. A, Trial Tr. 1/26/2016 AM at 72:25-73:8)   It was therefore more than reasonable for a jury to discount his analysis in this regard.

### C.    Motio Demonstrated That The IVC Product Contains an Automated Agent "To Provide Automated Version Control"

Motio demonstrated at trial that the IVC product contains an automated agent "to provide automated version control to the business intelligence artifact."  In its Motion and as it did at

trial, Avnet attempts to conflate the manual check out and check in functionality found in the prior art references with the native Cognos save functionality.   Motio presented substantial evidence that the manual check out/in functionality is different from the native Cognos save button.   The jury rejected Avnet's argument.

Mr. Martin explained that once a user hits the native save button in Cognos, IVC, without the user's awareness or input, saves the report specification as a version in the IVC database. (Ex. A, Trial Tr. 1/21/2016 AM at 66:17-67:4)   Mr. Martin stated this process was automatic. (Ex. A, Trial Tr. 1/27/2016 AM at 72:8 – 74:1)   Mr. Weiss also testified that when a user hits the save button in Report Studio a version of that report will be created in the ICS database without any further user interaction. (Ex. A, Trial Tr. 1/22/2016 AM at 61:6-10) ("When the user hits the save button in Report Studio, if that save causes an update command to be sent to the IBM Cognos Dispatcher for that report specification, a version of that report will be created without any further user interaction in the ICS repository, yes.").   Dr. Grimes also stated that when a user hits the save button a version is created in the ICS database without the user doing anything else. (Ex. A, Trial Tr. 1/26/2016 AM at 70:15-25).   A reasonable jury could determine that such action is automatic and therefore meets this claim limitation.

Avnet's attempt to conflate a manual check in/out process with that of the native Cognos save should be discounted by the Court for at least two reasons.   First, Avnet's citation to prior art to demonstrate that it doesn't infringe is improper.   The validity of a patent and whether it is infringed are two distinct issues. *Pandrol USA, LP v. Airboss Ry. Products, Inc.*, 320 F.3d 1354, 1365 (Fed.Cir 2003) (stating that "though an invalid claim cannot give rise to liability for infringement, whether it is infringed is an entirely separate question capable of determination

without regard to its validity."); *Medtronic, Inc. v. Cardiac Pacemakers, Inc.*, 721 F.2d 1563, 1583 (Fed.Cir.1983) (same).

Second, there was extensive testimony explaining the differences between check in/out and the version control method of the '678 Patent.  This included Avnet's Dr. Grimes testifying that check in/out and the save button in Cognos are "significantly different."  (Ex. A, Trial Tr. 1/26/2016 AM at 91:12-24)  In addition, Dr. Grimes admitted that Avnet's ICM provided a manual check-out/check-in process.  (*Id.* at 89:8-10).  Consistent with Dr. Grimes' testimony is that of Mr. Weiss who stated that manual check-out/check-in version control was inefficient and unwieldy.  (Ex. A, Trial Tr. 1/22/2016 AM at 69:9-14) ("Q. Isn't it true that Avnet customers and prospects complained that issues were existing, version control systems were inefficient and manual and not very helpful? A. My understanding is that they were inefficient, that there were several manual steps to – that made it, as I said, unwieldy.")[7]  Substantial evidence was presented at trial to allow a reasonable jury to determine that the IVC product provides automated version control as claimed.

**VII.   AVNET HAS NOT SHOWN THAT A REASONABLE JUROR COULD NOT FIND THAT THERE IS NOT CLEAR AND CONVINCING EVIDENCE THAT THE WRITTEN DESCRIPTION REQUIREMENT OF 35 USC § 112 IS NOT SATISFIED**

   **A.   Legal Standard**

A U.S. patent is presumed valid and cannot be invalidated absent clear and convincing evidence. 35 U.S.C. §282.  Clear and convincing evidence means evidence that makes the facts highly probable.  *Colorado v. New Mexico*, 467 U.S. 310, 316 (1984).

---

[7] The testimony Avnet cites in its Motion (p.23) relates to manual check-out/check-in version control <u>not</u> the native save button in Cognos.

The written description requirement is the bolded section in 35 U.S.C. 112 ¶1:

> **The specification shall contain a written description of the invention**, and of the manner and process of making and using it, in such full, clear, concise, and exact terms as to enable any person skilled in the art to which it pertains, or with which it is most nearly connected, to make and use the same, and shall set forth the best mode contemplated by the inventor or joint inventor of carrying out the invention.

The written description requirement is met where "the disclosure of the application relied upon **reasonably conveys to those skilled in the art** that the inventor had possession of the claimed subject matter as of the filing date." *Bard Peripheral Vascular, Inc. v. W.L. Gore & Assocs.*, 670 F.3d 1171 (Fed. Cir. 2012) (emphasis added).

As the Federal Circuit stated in its *en banc* decision in *Ariad Pharms., Inc. v. Eli Lilly & Co.*, 598 F.3d 1336, 1352 (Fed. Cir. 2010) (*en banc*):

> [W]hatever the specific articulation, the test requires an objective inquiry into the **four corners of the specification** from **the perspective of a person of ordinary skill in the art.** Based on that inquiry, the specification must describe an invention understandable to that skilled artisan and show that the inventor actually invented the invention claimed.

*Id.* at 1351 (emphasis added).

The written description "requirement does not demand any particular form of disclosure, or that the specification recite the claimed invention *in haec verba* [*i.e.*, using the same words that appear in the claims]...." *Ariad,* 598 F.3d at 1352. Thus, a patent is not invalid for lack of written description simply because the specification does not "specifically mention a limitation that later appears in the claims." *All Dental Prodx LLC v. Advantage Dental Prods.*, 309 F.3d 774, 779 (Fed. Cir. 2002).

What would be known to one of ordinary skill in the art need not be disclosed in detail. *Capon v. Eshhar*, 418 F.3d 1349, 1357 (Fed. Cir. 2005) ("The 'written description' requirement must be applied in the context of the particular invention and the state of the knowledge …  As each field evolves, the balance also evolves between what is known and what is added by each inventive contribution."); *Hybritech Inc. v. Monoclonal Antibodies, Inc.*, 802 F.2d 1367, 1384 (Fed. Cir. 1986); *Vas-Cath, Inc. v. Mahurkar*, 935 F.2d 1555, 1563 (Fed. Cir. 1991).

### B.    The '678 Specification Does Provide Support for the Claims

Defendants allege that the '678 specification does not support the claim term "**detecting a request to the business intelligence system to modify the initial version.**"  Defendants argue that the specification only supports an automated agent that detects a request *after* the artifact is saved – i.e. by periodically polling the system to see if a saved version has been modified. Defendants argue that the specification does not support an automatic agent that detects a request as the user initiates an activity such as hitting the "save" button.  Defendants are incorrect.

Specifically, Avnet (pp. 26-27) relies upon the testimony of its technical expert, Jack Grimes, that the only type of automatic version control disclosed in the '678 specification is polling in a "passive loop" at a "predetermined interval" and that "detecting a request … to modify" is not "explicitly or inherently disclosed in the specification."  However, Avnet ignores the other evidence in the case.

1.    **The Specification Has Adequate Written Description**

Figure 2 of the specification is reproduced below with added highlights.



The '678 Specification describes the use of the automated agent to record and maintain current and historical versions of the business intelligence artifacts.  (PTX1, 3:41-48)  Moreover, the specification (including Figure 2) include numerous references to language which supports the "detecting a request" language at issue:

- **FIG. 2:** Figure 2 shows that the automated agent "Continually Monitors …" the Business Intelligence Software Environment and "Automatically Stores Versions" to the Version Control Repository (the customer server).

- **Col. 4., ll. 20-23:** "FIG. 2 illustrates the system of the invention working in conjunction with the business intelligence software installation.  The purpose of the invention is to ***continuously monitor***, verify, and report on the business intelligence software." (emphasis added)

- **Col. 1, ll. 6-11:** "This invention relates to continuous integration of business intelligence software, and more particularly to ***establishing an automated agent that continuously monitors changes to***, and the health and consistency of, a business intelligence software installation and its corresponding metadata models, report specifications, and analysis cubes …" (emphasis added)

Mr. Lynn Moore, a co-inventor of the '678 Patent, testified that in Figure 2 "continually monitors" "means always on, never off, constant.  It's like a continuous flow of water.  The continuous flow of water never stops.  It's always on." (Ex. A, Trial Tr. 1/19/2016 PM at 96:20-97:2)  He testified that the term "continuously monitors" means both periodic polling and "continuously doing something.  It never stops.  And you're monitoring something, which means you're looking for something."  (Ex. A, Trial Tr. 1/20/2016 AM at 80:16-19)

Similarly, Mr. Martin, Motio's technical expert, testified that the words "continuously monitor" in Figure 2 mean ready to go at any time, that is, you have a system that has a sensor that monitors the system by sensing an event which is triggered by the user performing an action, i.e. saving a report specification.  (Ex. A, Trial Tr. 1/27/2016 AM at 62:19-63:21)  Mr. Martin

testified that this is "active version control" and covered by claims 1-3. (Ex. A, Trial Tr. 1/27/2016 AM at 65:20-23)

Defendants (pp. 27-28) cite to Mr. Martin's testimony that "Figure 2 is the kind of environment in which Figure 1 applies" and recklessly conclude that this has to mean that Figure 2 only discloses polling.  The fact that Figure 2 supports polling, does not mean that it also does not support "detecting a request to modify."  Mr. Martin testified that polling is "one way of doing it.  I don't take it to mean exclusively this is the only way to have it done…." (Ex. A, Trial Tr. 1/27/2016 AM at 126:23-127:8)  Mr. Moore testified that Figure 2 shows both, "detecting a request … to modify" and polling.  (Ex. A, Trial Tr. 1/20/2016 AM at 80:7-81:8)  Moreover, this is consistent with both Mr. Martin and Dr. Grimes testimony that claims 1-3 cover active version control ("detecting a request to modify") and claims 4-6 cover polling where it monitors on a predetermined interval. (Ex. A, Trial Tr. 1/26/2016 AM at 32:9-25; 1/27/2016 AM at 65:20-66:4) Figure 2 is the support for both sets of claims.

Defendants' own documents describe its version control as "continuously preserving authored content." (DTX 1350)  Dr. Grimes testified that this is active version control and not passive version control.  (Ex. A, Trial Tr. 1/26/2016 AM 96:3- 98:2)  This is consistent with the '678 Patent which describes active version control, i.e. "detecting a request to modify" as "continuously monitoring."

This is sufficient evidence for a jury to determine that the specification as a whole – including both the written description and the Figures – demonstrates to a person of ordinary skill in the art that Motio was in possession of a system which performed both types of version control.

Finally, even if the '678 specification only discussed polling and did not expressly refer to the automated agent "detecting a request," the claims are not invalid for failing to comply with the written description requirement.  As discussed *supra*, the written description requirement does not require the specification to mention every claim limitation.  *Ariad,* 598 F.3d at 1352; *All Dental Prodx*, 309 F.3d at 779 (Fed. Cir. 2002).  Rather, it includes what one of ordinary skill in the art would understand from the specification.  *Capon,* 418 F.3d at 1357; *Id.*

### 2.      The Patent Examiner's Actions During Prosecution Support Adequate Written Description

The actions of the Patent Examiner during prosecution of the '678 Patent further demonstrate that adequate written description exists for the term "detecting a request … to modify."  Specifically, in a Final Office Action dated December 3, 2011, the Examiner rejected application claims 8-11, 13-15, 22 and 26 as failing to comply with the written description requirement of 35 U.S.C. § 112 ¶ 1. (PTX2, pp.126-127)  The Examiner did <u>not</u> reject pending claims 1 or 16 which contained the claim term "detecting a request … to modify" that is currently challenged by Defendants.  (*Id.*)

The Examiner's § 112 ¶ 1 rejection of some claims but not the claims containing the terms at issue shows that he was carefully reviewing for written description issues in the application, yet found no issue with the claim term "detecting a request … to modify."  The Examiner thus agreed that adequate written description existed, and issued the '678 Patent with claims that included the term "detecting a request … to modify."  Such a decision is entirely consistent with the unanimous PTAB decision.

### 3.    The Patent and Trademark Board of Appeals ("PTAB") Held That The Specification Supports The Claims

Motio offered the PTAB proceeding during an offer of proof outside the presence of the jury. (Ex. A, Trial Tr. 1/27/2016 PM at 157:6-161:23)   After Motio filed this litigation, Defendants filed a Petition for *Inter Partes* Review of the '678 Patent with the PTAB arguing that the '678 Patent was invalid under 35 U.S.C. §§102, 103 based upon numerous prior art references.   After reviewing the '678 specification and claims, the PTAB denied Defendants' Petition and held that the specification disclosed both methods of version control (*before* and *after*).

Specifically, in their Petition, Defendants argued that "detecting a request to modify" "should be construed to include ***any form* of detecting that a request to modify has been made**, including polling the artifacts to detect that changes have been made." (PTX3A, p.12) For the term "automated agent," Defendants argued it meant "any software that actively performs version control of business artifacts." (PTX3A, p.10)

In reviewing the '678 specification and interpreting the claims terms at issue, the PTAB disagreed with Defendants' interpretation of "automated agent" but expressly stated that the '678 specification discussed <u>both</u> detecting (1) <u>a request for modification</u> to a report specification (*before*) or (2) <u>a modification</u> to a report specification (*after,* i.e. polling):

> Motio disputes this [Avnet's] construction [of the automated agent] and argues that the **claims and specification** of the '678 Patent require that the "automated agent" is external to, and interfaces with, the business intelligence system to provide automated version control to a business intelligence artifact, **that it independently detects either a request for modification or a modification to a business intelligence artifact**, and that it automatically stores the subsequent version.  **We are persuaded by Motio's arguments on construction of the term.**

(PTX3C, p.9, emphasis added)

The PTAB further explained that the '678 Patent specification discloses an invention that automatically and continuously monitors the business intelligence software – either upon detecting a request for a modification or detecting a modification (polling*). (Id.* at p.10)

## VIII.   AVNET HAS FAILED TO SHOW THAT A REASONABLE JUROR COULD NOT HAVE FOUND THAT THERE IS NOT CLEAR AND CONVICING EVIDENCE THAT THE CLAIMS OF THE '678 PATENT ARE INVALID UNDER 35 U.S.C. §102(B)

Defendant's motion for judgment as a matter of law of invalidity under 35 U.S.C. §102(b) is really a motion for summary judgment that U.S. Patent No. 8,285,678 ("the '678 Patent") is invalid under 35 U.S.C. §112 ¶1 because its parent patent (U.S. Patent 7,885,929 -- "the '929 Patent") does not provide support for claims 1-3 of the '678 Patent.  Specifically, the parent '929 Patent was filed on January 3, 2006.  The '678 Patent is a continuation of the '929 Patent and was filed on December 30, 2010.  The Defendants' **entire** argument is that because the claims of the '678 Patent are not supported by the '929 specification under 35 U.S.C. §112 ¶1, they are not entitled to the filing date of the '929 Patent, and because MotioCI was sold more than a year before the filing date of the '678 Patent, the '678 Patent is invalid under 35 U.S.C. §102.  Thus, the **sole** issue is whether the specification of the '929 Patent provides support for the claims of the '678 Patent under 35 U.S.C. §112 ¶1.

As discussed above, there was sufficient evidence for the jury to find that there was not clear and convincing evidence that the specification of the '929 Patent does not provide support for the claims of the '678 Patent under 35 U.S.C. §112 ¶1.  Moreover, Defendants' argument that Motio has the burden of proof is incorrect.

Defendants refuse to acknowledge that the '678 Patent is a **continuation** of the '929 Patent, and not a **continuation-in-part.** A "continuation" is a patent application with claims based on the disclosure of an earlier patent application. A "continuation-in-part" ("CIP") is a patent application with some claims based on the disclosure in the earlier application and some claims based on new matter in the CIP application. *Technology Licensing Corp. v. Videotek, Inc.,* 545 F.3d 1316, 1321, n.2 (Fed. Cir. 2008), citing *Transco Prods. Inc. v. Performance Contracting, Inc.* 38 F.3d 551, 555 (Fed. Cir. 1994). Because certain claims rely on the original specification and other claims rely on the CIP specification, "[d]etermining the effective filing date that each claim in a CIP application is entitled to can be quite complex." *PowerOasis, Inc. v. T-Mobile USA,* 522 F.3d 1299, 1305 (Fed. Cir. 2008). Thus, only when the patentee is alleging that the claims in a CIP application are entitled to the filing date of the earlier application does the patentee have to show that the support for the claims is in the original specification.

Defendant relies upon *Technology Licensing,* 545 F.3d 1316 (Fed. Cir. 2008), *PowerOasis, Inc. v. T-Mobile USA,* 522 F.3d 1299 (Fed. Cir. 2008), and *Anascape , Ltd. v. Nintendo of America, Inc.,*601 F.3d 1333 (Fed. Cir. 2010). However, in all three cases the patent at issue was a CIP. In the present case, the '678 Patent is a continuation of the '929 Patent, and thus **their disclosures are identical.** One does not have to see if the claims have support in the original '929 specification or support in the '678 specification. **They are the same exact disclosures.** That is why the '678 Patent is a continuation of the '929 Patent. Since the '678 Patent meets the written description requirement as discussed above, the '929 Patent necessarily provides support for the claims in the '678 Patent.

## IX.    THE '678 PATENT CLAIMS A SPECIFIC TYPE OF VERSION CONTROL AND IS THUS PATENT ELIGIBLE

The Defendants incorrectly argue that he '678 Patent claims ineligible subject matter. Like the Defendants, Motio relies upon its summary judgment briefing, some of it is set forth below. (Dkt #170)

The '678 Patent claims a specific method of providing implicit, non-optional version control to a business intelligence system.  The invention uses a specific structure in the form of an automated agent that is external to the business intelligence system and without any human intervention (1) interfaces with the business intelligence system, (2) automatically stores the initial version of the report specification in a version control repository, (3) automatically detects a request to modify the initial version of the report specification, and (4) automatically stores subsequent versions of the report specification in the version control repository.

### A.    The '678 Patent Does Not Claim A Broad Monopoly to Version Control

Version control with a computer has been known and used after the introduction of the Internet.  However, the version control claimed in the '678 Patent was new.  It is specific as to structure and method of operation.  The '678 Patent does not simply use a computer to automate what was done pre-Internet or after introduction of the Internet.  Rather, the opposite is true as the invention vastly improves upon what was previously done with computers and the Internet.  The claimed invention solves a computer specific problem: without any human intervention, provides external automated version control capabilities to a business intelligence system that does not natively provide version control capabilities by monitoring activities in the business intelligence system and detecting requests to modify report specifications.  The specific claimed method with the structure disclosed does not

"represent the basic tools of scientific and technological work" and is not the basic "building blocks of human ingenuity" *Smartflash*, 2015 WL 661174*3 quoting *Alice,* 134 S.Ct. at 2354.

Rather, the '678 claims "integrate the building blocks into something more" which is patentable. *Id.* It integrates an automated agent into a business intelligence system to perform automated version control in the specific way described above.  It does not claim a broad monopoly to the abstract idea of version control.  There were prior methods of version control which are still used today many of which were disclosed to the USPTO during prosecution, and many of which were cited by the Defendant as prior art in their petition for *Inter Partes* Review.

### B.    The Claimed Invention Provides a Unique Structure With a Specific Method

The '678 patented method including its unique structure is not a fundamental economic practice  known prior to the Internet  or computers  and is not a general  building block of human ingenuity.  The invention was not made possible simply because of the Internet or developing computer technology.  The broad concept of version control has been known for decades and different types of version control are currently being used.  The most practical real-world evidence is that the Defendants have received their own patent on their version control product and deny their product has the structure or operation of the '678 claimed version control.

X.      **MOTIO PRESENTED SUBSTANTIAL EVIDENCE THAT THE '678 PATENT IS VALID IN VIEW OF HUMMINGBIRD AND GENTNER**

A.      **There Is Not Clear and Convincing Evidence That Claims 1-3 Are Invalid As Being Obvious In View Of Hummingbird**

Defendants allege that there is clear and convincing evidence that the '678 claims are invalid as being obvious in view of the Hummingbird reference.  They are incorrect.  The issue of obviousness is determined at the time of the invention by a person of ordinary skill in the art. 35 U.S.C. §103; *KSR Int'l Co. v. Teleflex Inc.*, 127 S.Ct.1727, 1742 (2007).  Whether a patent is invalid as being "obvious" under 35 U.S.C. §103 depends upon four underlying factual questions:

> (1)  the scope and content of the prior art;
>
> (2)  the differences between the prior art and claims;
>
> (3)  the level of ordinary skill in the pertinent art; and
>
> (4)  the objective evidence.

*KSR*, 127 S.Ct.  at 1734, citing *Graham v. John Deere Co. Kansas City*, 383 U.S. 1 (1966).  To overturn a jury verdict, it is incumbent upon Avnet to provide an analysis of this four part test and explain where and why the prior art renders the '678 Patent obvious.  Avnet does not do this. Rather, it only provides generalized statements from Dr. Grimes and summarily concludes the '678 Patent is obvious.

Although the ultimate question of obviousness is a question of law, it turns on the four underlying factual inquiries.  *Commonwealth Scientific and Industrial Research Organization v. Buffalo (USA), Inc.*, 542 F.3d 1363, 1375 (Fed. Cir. 2008).  Thus, when there are disputed factual issues, such as (1) the scope and content of the prior art, and (2) the difference between the prior

art and the claims and the prior art, the issue of obviousness is determined by the trier of fact.  *Id.* at 1377; *Kinetic Concepts, Inc. v. Blue Sky Medical Group, Inc.*, 554 F.3d 1010, 1021 (Fed. Cir. 2009).

First and foremost, Defendants allege that "the Hummingbird prior art operated in ***exactly the same way*** as the accused product."  This is nonsensical.  Defendants are combining the issues of infringement and validity.  This is a common ploy to confuse the issues and has caused the Federal Circuit to repeatedly and emphatically state that infringement and validity are separate issues.  *Pandrol USA, LP v. Airboss Ry. Products, Inc.*, 320 F.3d 1354, 1365 (Fed.Cir 2003) (stating that "though an invalid claim cannot give rise to liability for infringement, whether it is infringed is an entirely separate question capable of determination without regard to its validity."); *Medtronic, Inc. v. Cardiac Pacemakers, Inc.*, 721 F.2d 1563, 1583 (Fed.Cir.1983) (same).  Moreover, Hummingbird and Defendants' IVC are very different.

Specifically, the Hummingbird reference repeatedly states its version control is a manual check-in/check-out system. (DTX1307, pp. 272, 291)  Mr. Moore explained that in a manual check-in and check-out process, the user must first check-out a document to the local computer before the user can begin to edit the document.  After editing the document and potentially saving it numerous times, the user must take a separate explicit action to also check it back into a version control repository, and if the user does not take that action, a new version of the document is not recorded in the version control repository.   (Ex. A, Trial Tr. 1/19/2016 PM at 85:24-87:11)  This was in stark contrast to the patented version control where when the user saves the document to the business intelligence system, the version control automatically happens without their knowledge.  (Ex. A, Trial Tr. 1/19/2016 PM at 90:7-91:9)

Dr. Grimes testified that "Hummingbird is your conventional check-in/check-out version control system." (Ex. A, Trial Tr. 1/26/2016 PM at 21:13-15) Grimes testified that Hummingbird requires an "action that the editor uses to put it in the repository" and this is different than the previous action where the editor saves it to the system. (Ex. A, Trial Tr. 1/26/2016 PM at 19:23-p. 20:9)  Similarly, Mr. Martin testified that Hummingbird was a manual check-in process and as a result was not "automatic" because the user must perform an additional act of checking in the document. (Ex. A, Trial Tr. 1/21/2016 AM at 38:21-39:24; Ex. A, Trial Tr. 1/27/2016 AM at 92:20-93:19)  Mr. Martin testified that Hummingbird's manual check-in and check-out process did not have several elements of the claims, including an automated agent.  (Ex. A, Trial Tr. 1/27/2016 AM at 95:23-96:8)

Defendants' argument that Hummingbird discloses an "interceptor" that is the same as the "filter" in MotioCI is disingenuous.  Mr. Martin testified that that this term as used by Hummingbird "has nothing to do with the filter" in MotioCI or the automated agent of the '678 Patent.  Rather, it is a mechanism that allows the user to turn on any application and, if preconfigured, will launch and work with the Hummingbird system. (Ex. A, Trial Tr. 1/27/2016 AM at 94:15-95:22)   It is simply not an automated agent that detects a request to modify.

## B.   Motio Presented Substantial Evidence Regarding the Objective Indicia of Non-Obviousness

Tellingly, Defendants' analysis completely ignores the objective evidence of nonobviousness.  The fourth factual inquiry, the "objective evidence" are the "real-world" facts such as commercial success, long-felt-need, failure of others, skepticism, unexpected results, and copying.  *Ecolochem, Inc. v. Southern California Edison Co.*, 227 F.3d 1361, 1376-1380 (Fed. Cir. 2000).  Because the objective evidence are actual facts in the relevant industry, they are

"worthy of great weight" and "the most probative evidence of nonobviousness." *Ortho-McNeil Pharm., Inc. v. Mylan Labs., Inc.*, 520 F.3d 1358, 1365 (Fed. Cir. 2008).   As the Federal Circuit notes: "[a]s we have repeatedly emphasized, evidence relating to secondary considerations constitutes independent evidence of nonobviousness and can be quite instructive in the obviousness inquiry." *Id.*

Motio presented substantial evidence that Defendants clandestinely sought and received detailed information on how the Motio CI product operated, and soon thereafter admittedly changed the underlying operation of the IVC product to implement the same method used in the Motio CI product.   As discussed in detail *supra*, pp. 10-11, this included implementing a filter in its IVC product to version report specifications.

Defendants' unsupported statement that Motio did not demonstrate a nexus between the copying and the '678 Patent is without merit.   Mr. Martin explained that the filter and ICS service constitute the "automated agent" limitation of claim 1. (Ex. A, Trial Tr. 1/20/2016 PM at 110:1-3) ("In my review of the source code and documentation for IVC, it's my opinion that the automated agent consists of the IVC filter/interceptor and ICS/IVC service")  Defendants agreed. Dr. Grimes testified that the filter was part of the automated agent. (Ex. A, Trial Tr. 1/26/2016 PM at 54:2-4) ("Q. So, Dr. Grimes, here is the filter, which we'll call the automated agent. A. It's part of the automated agent.")  It cannot be disputed that the copying evidence presented by Motio is directed to Defendants' copying of the filter which Dr. Grimes concedes is part of the automated agent.   As such Motio presented evidence in which a reasonable jury could determine that Defendants' copying was directly related to Claim 1 of the '678 Patent.   The jury heard all of the testimony and determined that there was not clear and convincing evidence that

Hummingbird invalidated the '678 Patent.  There was sufficient evidence for the jury to have found that there was not clear and convincing evidence that Hummingbird rendered claims 1-3 obvious.

     **C.**    **There Is Not Clear and Convincing Evidence That Claims 1-3 Are Invalid As Being Obvious In View Of Hummingbird With Gentner**

Mr. Martin testified that the Gentner prior art discloses a method that saves a document while the user is creating it, so if the computer crashes before the user saves the document, it can be recovered.  (Ex. A, Trial Tr. 1/27/2016 AM at 95:23-97:25)  However, it was not saving different versions – it was only saving the current document as the user was typing.  (Ex. A, Trial Tr. 1/27/2016 AM at 98:1-15)  Mr. Martin further testified that Gentner did not detect a request to modify and could not be combined with Hummingbird because it brings no functionality, as it only assists the user prior to hitting the save button, and does nothing after the user hits the save button. (Ex. A, Trial Tr. 1/27/2016 AM at 99:18-100:16) Therefore, even combining Gentner with Hummingbird would not result in the system having an automated agent that detects a request to modify. (Ex. A, Trial Tr. 1/27/2016 AM at 101:10-12)

**XI.**    **MOTIO PRESENTED SUBSTANTIAL EVIDENCE THAT IT WAS ENTITLED TO LOST PROFITS AND A REASONABLE ROYALTY**

     **A.**    **There was Sufficient Evidence to Support Lost Profits**

Avnet alleges that Mr. Cobb's testimony regarding market share is not based on any evidence.  This is incorrect.  Specifically, Mr. Cobb provided three options for the jury, that Motio would have made 95%, 85% or 75% of Avnet's infringing sales, which would result in approximately either $1.65 million, $1.55 million or $1.44 million in lost profits, respectively.

(PTX 170)  The jury verdict provided $1,095,807 in lost profits – less than 75%.  Thus, the jury did not simply award what Mr. Cobb opined.  Rather, it applied the evidence that it heard.

Moreover, the percentages were not simply arbitrary assumptions.  Mr. Cobb testified that "I need to understand the market and its players" (Ex. A, Trial Tr. 1/21/2016 PM at 14:20-21) and so "if BSP were not in the market, would customers buy from Motio or would they go somewhere else to a non-infringing substitute product." (Ex. A, Trial Tr. 1/21/2016 PM at 14:25-15:3)  He studied the other potential players, Envisn, Locus Solutions and Technology Dynamics" and had discussions with Motio management. (Ex. A, Trial Tr. 1/21/2016 PM at 17:9-22)

Mr. Moore testified that Motio has not competed against Envisn in the last four years (Ex. A, Trial Tr. 1/20/2016 PM at 11:10-15) and that Locus Solutions never sold a version control product. (Ex. A, Trial Tr. 1/20/2016 AM at 39:25-40:11)  Mr. Cobb determined that Technology Dynamics "was not a factor" as Motio has not encountered them in the marketplace, Motio has not seen Locus Solutions in the marketplace for at least three years, and that Envisn would infrequently bid against Motio. (Ex. A, Trial Tr. 1/20/2016 PM at 17:23-18:24)  Mr. Moore also testified that 10 percent of the time Motio would not bid against anyone and 90 percent of the time it would bid only against Avnet. (Ex. A, Trial Tr. 1/20/2016 AM at 29:22-30:2)

Mr. Cobb also relied on Mr. Moore's testimony (Ex. A, Trial Tr. 1/21/2016 PM at 20:9-17) and on the Defendants' Mr.Weiss testimony that the prior art version control systems were inefficient and not helpful.  (Ex. A, Trial Tr. 1/21/2016 PM at 19:7-12)     Thus, there is more

than sufficient evidence for a jury to have determined the percentage of Avnet sales that Motio would have made.  It was up to the jury to weight all of the evidence and make its determination.

### B.    There was Sufficient Evidence to Support Reasonable Royalty

Defendants' allege there was insufficient to evidence to support a 75% royalty rate. However, there is no evidence that the jury awarded a 75% royalty rate.  The total award was $1,224,955, and the royalty amount was $129,148.  There is no evidence of what portion was for lost profits, what percentage was for a reasonable royalty and what royalty rate it applied.  It might have applied the 5.6% royalty rate proffered by Defendants' damage expert, Mr. Parr.

Defendants argue that Motio did not consider the infringed version control product, IVC, from the Defendant's other products in ICS.  Defendants are incorrect.  Mr. Cobb provided detailed damage computations for version control only (IVC) and for ICS -- the suite that includes version control -- and provided both to the jury for consideration. (PTX 170, 162, 163, 165, 166, 167, 168)  He also provided detailed testimony why Motio should be awarded damages for ICS, not just IVC, as IVC was the "primary driver" of the other modules in ICS, including the fact that IVC was the first module introduced and all of the other modules were built on top of it, that ICM could not be used without IVC, and that the other modules had enhanced functionality with IVC.  (Ex. A, Trial Tr. 1/21/2016 PM at 6:16-9:18)  This is consistent with Defendants' Mr. Evans' testimony that Avnet advertised its products on the Internet so that all other modules could only be purchased after purchasing IVC. (Ex. A, Trial Tr. 1/21/2016 PM at 103:20-110:16; PTX 32)

Finally, Defendants argue that Avnet's average profit margin was 29% and Avnet's average profit margin was 11.9%.  Because we do not know what royalty rate the jury used, this

argument is irrelevant.  Moreover it is wrong.  Specifically, Mr. Cobb presented PTX 161, which are Avnet's financials produced by Avnet.  It shows total revenues of $1,315,155 and gross profit of $1,228,391, which is a 93.4% profit margin.   (Ex. A, Trial Tr. 1/21/2016 PM at 34:12–22; 37:3-38:4)

Finally, Defendants' argument that the total amount of revenues in the U.S. was only $160,781.63 is incorrect.  There is substantial evidence that Avnet's total revenues of IVC and ICS are $1,315,155 as stated in **Avnet's financials.** (PTX 161)  In Avnet's financial documents, there are no sales listed as foreign sales.   Avnet relies on DTX 1331 to show that all but $160,781.63 comes from foreign sales.  However, this is not substantial evidence.  First, there is no evidence of what DTX 1331 is.  It was an exhibit to Mr. Parr's report and only states the vendor name, company name and country.  It could have been created by anyone for any purpose.  There is no back-up material or any other support for the entries on the document.  It certainly is not a business document.   Critically, it does not state <u>where</u> the product was used. For example, one company is Teva Pharmaceuticals headquartered in Israel.  However, it has offices world-wide, including throughout the U.S.  It would be analogous that everything sold to Samsung is used in South Korea because its headquarters are in South Korea.

## XII.   AVNET IS NOT ENTITLED TO A NEW TRIAL

### A.   Avnet's Copying of MotioCI is Highly Relevant to the Issues Presented During Trial

Even though the Federal Circuit has called the objective evidence – including copying – the "real-world" facts "worthy of great weight" and "the most probative evidence of nonobviousness" which can constitute independent evidence of nonobviousness, Defendants complain that such evidence should not have been introduced at trial and vaguely claiming that

such evidence was not relevant and highly prejudicial.  Significantly, Defendants do not present any evidence beyond attorney argument that its copying was not relevant to trial.  As such, its request for new trial should be denied.

As described in detail above, objective indicia of non-obviousness – including copying – is highly relevant and probative to whether a patent is obvious and must be considered.  Avnet merely seeks to ignore the extensive Federal Circuit case law on this point.  The evidence of Defendants' copying was neither irrelevant nor unduly prejudicial.  Even if it were, the evidence does not "strongly and overwhelmingly" favor the Defendants such that a reasonable jury could not have returned the verdict upon which it deliberated.  As such a new trial is not warranted.

### B.   Defendants Are Not Entitled to a New Trial on Infringement or Validity

Defendants argue that they are entitled to a new trial, as an alternative to judgment as a matter of law.   In evaluating whether the parties and this Court should undergo a second trial, this Court must view the evidence in the light most favorable to the jury's verdict.  *Hitachi*, 2013 WL 5273326, at *2.  The jury's verdict "must be affirmed unless the evidence points to strongly and overwhelmingly in favor of [Defendants] that the court believes reasonable persons could not arrive at a contrary conclusion."  *Id*.  Defendants only state that this request is alternative relief to their judgment as a matter of law but do not provide any analysis whatsoever.  For all of the reasons discussed above, the jury's verdict was based upon substantial evidence presented by Motio and therefore should not be disturbed.

## XIII.    <u>CONCLUSION</u>

For the above reasons, Motio respectfully requests that the Court deny Avnet's Motion.


Dated:  April 21, 2016                              Respectfully Submitted,


                                                    */s/ Jeffrey M. Drake*
                                                    Jeffrey M. Drake
                                                    Lee F. Grossman
                                                    **MILLER, CANFIELD, PADDOCK AND STONE, P.L.C.**
                                                    225 West Washington Street, Suite 2600
                                                    Chicago, Illinois  60606
                                                    Telephone:  (312) 460-4200
                                                    Facsimile:  (312) 460-4201
                                                    drakej@millercanfield.com
                                                    grossman@millercanfield.com


                                                    Byron K. Henry
                                                    **SCHEEF & STONE, L.L.P.**
                                                    2600 Network Boulevard, Suite 400
                                                    Frisco, Texas  75034
                                                    Telephone:  (214) 472-2116
                                                    Facsimile:  (214) 472-2150
                                                    Byron.Henry@solidcounsel.com
                                                    Kelly J. Kubasta
                                                    **FERGUSON, BRASWELL & FRASER, PC**
                                                    2500 Dallas Parkway, Suite 501
                                                    Plano, Texas  75093
                                                    Telephone:  (972) 378-9111
                                                    Facsimile:  (972) 378-9115
                                                    kkubasta@dallasbusinesslaw.com

                                                    ***Counsel for Plaintiff***


**PLAINTIFF'S OPPOSITION TO**                                          **Page 40**
**RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW**

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on **April 21, 2016**, all counsel of record who are deemed to have consented to electronic service are being served with a copy of this document via the Court's CM/ECF system per Local Rule CV-5(a)(3).

/s/ *Kelly J. Kubasta*
Kelly J. Kubasta